In the Interest of C.G.L., a minor,

D.G.L., A.B.L., and the Cherokee Nation of Oklahoma, Appellants,

v.

The McDonald County Juvenile Office, Respondent.

No. 24223.

Missouri Court of Appeals, Southern District, Division One.

Jan. 4, 2002.

Chris M. Hunt, Grove, OK, for appellant.

John S. Dolence, Spencer, Scott & Dwyer, P.C., Joplin, for respondent.

ROBERT S. BARNEY, Chief Judge.

D.G.L. ("Grandfather") and A.B.L. ("Grandmother"), biological grandparents (collectively, "Grandparents") of C.G.L., a minor child and the Cherokee Nation of Oklahoma (collectively with Grandparents, "Appellants") appeal from the judgment of the Circuit Court of McDonald County ("juvenile court") approving the adoption of C.G.L. by J.B. and K.B. ("Respondents").[1] As more fully explained below, in their sole point on appeal, Appellants maintain the juvenile court erred in finding "good cause" to deviate from Indian "preferences" set out in the Indian Child Welfare Act ("ICWA"), when it approved of the adoption of C.G.L. by Respondents-foster parents. See 25 U.S.C.A. § 1915 and footnote 4, infra. We affirm.

Viewed in the light most favorable to the judgment, the record shows that C.G.L. was born on September 7, 1998, to A.L., the biological mother ("Mother"), and B.L., the biological father ("Father"), a registered Cherokee Indian, and son of Grandparents. C.G.L. was born with gastroschisis, a serious medical condition in which the intestines were located outside his body at birth. Immediate surgery was required to replace the intestines within his abdomen.

The child was released from the hospital in late October 1998 to his parents, who were living in the home of Grandparents. The medical condition of the child was such that it required him to be connected to electronic medical equipment for nutritional feeding. Father was trained at the hospital on how to use this equipment. However, while Mother had received training, she never learned how to properly operate the equipment, and Grandparents declined the opportunity to learn how to operate the equipment. Father and Moth-er were not working at the time. Grandfather worked during the evenings and Grandmother worked during the day. Grandmother suffered from diabetes and did not have a driver's license to operate a vehicle. Neither Father nor Mother had lived on an Indian reservation.

On November 30, 1998, the Division of Family Services ("D.F.S.") was called to the home of Grandparents to investigate a report of child abuse and neglect of the child. D.F.S. determined that Mother had left the child alone at the home. At that time, D.F.S. developed a "safety plan" in which Mother was not to be left alone to care for the child. D.F.S. personnel also spoke with Mother and Father about receiving counseling and enrolling in parenting classes.

Two weeks later, D.F.S. received a second report of child abuse and neglect. Upon responding to the home, D.F.S. discovered that Father had left the residence, the alarm on the child's medical equipment was sounding, and neither Mother nor Grandfather, who were at the residence at the time, knew how to operate the medical equipment. Grandfather advised D.F.S. that he and Grandmother had not learned how to operate the medical equipment because they believed that Father and Mother should take care of the child and were fearful that if they learned how to operate the equipment, Father and Mother would compel Grandparents to take over all of the child's care. At that time, D.F.S. placed the child into protective custody and placed him in Respondents' home. The evidence showed that Respondents specialized in the foster care of special needs children.

Over the next several weeks, D.F.S. worked with Mother and Father toward reunification with their child and allowed

1. Grandmother is a registered Cherokee Indian, as is C.G.L.

periodic visitation with C.G.L. On January 25, 1999, Father advised D.F.S. that he and Mother wished to place the child for adoption, and that neither Father nor Mother wanted anyone on either side of their families to adopt the child. The next day, Father and Mother met with D.F.S. to begin the process of voluntary relinquishment of their parental rights. Father and Mother requested that their families not be advised of their decision.

On June 17, 1999, the juvenile court entered a judgment terminating the parental rights of Father and Mother.[2] Thereafter, Respondents filed a petition for transfer of custody and final adoption. On September 8, 1999, the juvenile court entered an order transferring custody of the child to Respondents. In December of 1999, Appellants filed a motion to intervene and a petition for transfer of custody and adoption of the child. The juvenile court denied Appellants' motion to intervene. Appellants appealed. This Court reversed the decision of the juvenile court and remanded the case with instructions that Appellants be allowed to intervene. See In the Matter of C.G.L., 28 S.W.3d 502, 505 (Mo.App.2000).

On February 1, 2001, the juvenile court commenced a hearing on Appellants' motion to intervene and petition for transfer of custody and adoption, and Respondents' petition for final order of adoption. After hearing evidence the juvenile court entered its judgment of adoption of C.G.L. by Respondents.

■ The standard of review in adoption cases is the same as in other court-tried cases. See Murphy v. Carron, 536 S.W.2d 30 (Mo. banc 1976); I.D. v. B.C.D., 12 S.W.3d 375, 376 (Mo.App.2000). The judgment of the juvenile court must be upheld unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. Id.; In re S.L.N., 8 S.W.3d 916, 920 (Mo.App.2000); see also Rule 84.13(d).[3]

■ Initially, we observe that Respondents have challenged Appellants' brief as being deficient because it fails to conform to Rule 84.04(d). In the section of Appellants' brief titled "Points Relied On" the following was set out:

a) The Court erred in finding that "good cause" existed for deviation from the Indian preferences found in 11 U.S.C. § 1915.

b) This is because before "good cause" can be established, an inquiry must be made to determine whether there exists a placement home within the preferences set forth in § 1915 which can meet the extraordinary physical and emotional needs.

c) The failure of DFS and the Circuit Court to first inquire whether a preference home was available to meet CGL's extraordinary needs demonstrates a failure to comply with the Indian Child Welfare Act ("ICWA") and, therefore, violates a requirement of § 453.110.6(6).

■ While Appellant's point is questionable, we do not find that it expressly

2. From the record provided to this Court, we discern that a hearing to terminate the parental rights of Father and Mother was commenced on April 13, 1999. Father and Mother were not present, nor was the Cherokee Nation of Oklahoma represented. On that same day, the juvenile court sustained a motion filed by the Cherokee Nation of Okla-

homa to intervene. On May 19, 1999, a second hearing was held in which Father and Mother personally appeared and the Cherokee Nation of Oklahoma was represented by counsel.

3. All rule references are to Missouri Court Rules (2001).

violates Rule 84.04(d). Furthermore, "[w]here child custody is in dispute, questionable points on appeal will not be stricken even though the manner of stating the claimed deficiencies may hinder their review." *Rinehart v. Rinehart*, 877 S.W.2d 205, 206 (Mo.App.1994). "Appellate courts are more tolerant regarding technical requirements when the questions presented relate to the welfare of children." *Id.; see Stamme v. Stamme*, 589 S.W.2d 50, 54 (Mo.App.1979).

■ Appellants claim that the juvenile court erred in determining "good cause" existed to depart from federal statutory preference to place Indian children within Indian homes pursuant to the ICWA set out in 25 U.S.C.A. § 1915.[4] Appellants argue that D.F.S. did not follow the placement preferences of the ICWA when the child was placed in alternative care with Respondents on December 15, 1998, because Respondents were not affiliated with the Cherokee Indians, the child's Indian tribe. They also maintain that no attempt was made by D.F.S. to consider placing the child in an Indian home, despite Appellants' requests, and argue that D.F.S. refused to allow any visitation of the child with grandparents after Mother and Father signed parental release forms. Appellants also cite to the guidelines set out by the Bureau of Indian Affairs, see *infra*,

and argue that the "[g]uidelines, while not controlling, must be accorded great weight in construing the ICWA." They argue that the evidence demonstrated that the biological parents never requested placement for the child outside of the preferences set forth in 25 U.S.C. § 1915, and "[o]n the contrary, it was absolutely uncontroverted that the Indian father asked that the infant be placed with an Indian family." In reviewing the record, we disagree with Appellants' assessment of the evidence.

■ "Missouri law, specifically § 453.080.1(6), requires a court in which an adoption is pending, in determining if the adoption should be finalized, to ascertain whether there has been compliance with Indian Child Welfare Act, if applicable." *In re C.G.L.*, 28 S.W.3d at 505. "[A] determination of whether the trial court's findings comport with the requirements of ICWA involves a question of law and will be reviewed de novo." *L.G. v. State, Dept. of Health & Soc. Serv.*, 14 P.3d 946, 950 (Alaska 2000). "By its own terms § 1915(b) allows a State court to deviate from the list of preferred placements in § 1915(b) if 'good cause' exists for such deviation." *In the Interest of A.E.*, 572 N.W.2d 579, 583 (Iowa 1997).

In *L.G., supra*, the Supreme Court of Alaska observed that, "good cause to deviate from ICWA's placement preferences in

---

4. 25 U.S.C. § 1915 provides, in pertinent part:

(a) **Adoptive placements; preferences**
In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.
. . .
(b) **Foster care or preadoptive placements; criteria; preferences**
In any foster care or preadoptive placement, a preference shall be given, in the

absence of good cause to the contrary, to a placement with—
(i) a member of the Indian child's extended family; (ii) a foster home licensed, approved, or specified by the Indian child's tribe; (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.
. . .

a particular case depends on many factors including, but not necessarily limited to, the best interest of the child, the wishes of the biological parents, the suitability of persons preferred for placement and the child's ties to the tribe." *Id.* at 954 (quoting *In re Adoption of F.H.*, 851 P.2d 1361, 1363–64 (Alaska 1993)); *see also In re Adoption of M.*, 66 Wash.App. 475, 832 P.2d 518, 522 (1992). In particular, the Supreme Court of Alaska referred to certain directional guidelines promulgated by the Bureau of Indian Affairs that aid in determining whether good cause exists to deviate from the placement provisions of the ICWA. These are:

(i) The request of the biological parents or the child when the child is of sufficient age.

(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.

*L.G.*, 14 P.3d at 954–55 (quoting Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,594 (1979)).

Applying the foregoing guidelines to the facts of the instant matter, we now address the issue of whether evidence of "good cause" was shown sufficient to permit the juvenile court to have deviated from the ICWA.

At the final adoption hearing, Diane Cooper, an employee with D.F.S., testified that the reason the child was placed in protective custody and alternative care with Respondents on December 15, 1998, was because no one at the Grandparents'

residence was familiar with the operation of the medical equipment that the child needed in order to meet his nutritional needs. Ms. Cooper related that she notified the juvenile office that the child was an Indian child and that she was aware the juvenile office had notified a representative of the Cherokee Nation of Oklahoma of the situation. She also stated that when a representative of the Cherokee Nation of Oklahoma ultimately inquired why the child was not with a family member, she explained that the child required a "special needs" foster home and there was no one from the child's extended family nor any Indian family with the necessary background immediately available to properly care for him. Furthermore, Ms. Cooper related that "I took into consideration that—that [Father] told me on several occasions that he did not want this child placed with his family." Father was called by Appellants and testified that he did not recall making such a statement to D.F.S., as related by Ms. Cooper. However, he did not expressly *deny* making the foregoing statement and testified on cross-examination that "[m]y wife said it. I know that much." Father related that "before we went in [the D.F.S. office] she basically said she didn't want my parents to get him and if we was trying to make our marriage work that I needed to go along with her. That's why I chose just to remain neutral." [5] Father also acknowledged on cross-examination that at the time the child was placed in foster care, he did not then recommend that his parents adopt the child, nor did he make such a recommendation at a subsequent court appearance, when he and Mother voluntarily

5. Under similar circumstances where one parent wanted a child to be transferred to a reservation and the other did not, the Supreme Court of Iowa accorded little weight to the wishes of the parents in its determination whether good cause existed to deviate from the § 1915(b) preferences. *See In the Interest of A.E.*, 572 N.W.2d at 586.

relinquished custody of their child and consented to the adoption of the child.

Accordingly, Appellants' claim that the biological parents desired the child be placed with grandparents is not supported by the evidence. In fact, the evidence suggests the contrary, as reflected in the findings by the juvenile court. In its judgment, the juvenile court found that the evidence revealed that the biological parents of C.G.L. expressed a concern that Grandparents not be awarded custody of C.G.L., thereby satisfying one of the prerequisites to a showing of "good cause." "Due regard is given to the opportunity of the [juvenile] court to judge the credibility of witnesses." *I.D.*, 12 S.W.3d at 376. This Court defers to the judgment of the juvenile court and does not substitute its judgment for that of the juvenile court in determining if substantial evidence exists to support the judgment. *Id.* The juvenile court is accorded greater deference in custody and adoption proceedings than in other cases. *Id.; In re K.K.J.*, 984 S.W.2d 548, 552 (Mo.App.1999).

The juvenile court also found that expert testimony established that C.G.L.'s medical condition was such that it constituted an "extraordinary physical need of the child, fulfilling another of the [Bureau of Indian Affairs] suggested considerations for deviation from § 1915." Also, the juvenile court found that expert testimony established that the child would experience emotional trauma if removed from the home of Respondents.

The record shows that at the time the child was placed in alternative care with Respondents he was in a fragile physical condition, suffering from gastroschisis and connected to a TPN feeding tube some sixteen hours per day. Dr. Walter Andrews, a board certified pediatric surgeon and general surgeon, testified by deposition that the child was born with his intes-tines outside of his abdomen and that a surgical procedure was required to place his intestines back inside the abdomen. Dr. Andrews related that the child suffered from "short gut syndrome" a malady wherein the child could not take enough food by the mouth to be able to sustain the child due to insufficient absorption of nutrients from the "gut". The effect of this inability to absorb enough nutrients from food manifested itself by diarrhea, a constant risk of dehydration, and an inability to grow or thrive, which required the child to "go on central feedings or central intravenous feedings or what they call total parenteral nutrition." He opined that "short gut syndromes can be difficult to manage" but acknowledged that an average person could learn how to monitor a child's diet without problems, "[i]f they are committed to it and they go through the training and the education and make the commitment for the follow up visits, et cetera...." Dr. Andrews also opined that it "can sometimes take five years" before any child suffering from "short gut syndrome" might be able to absorb enough nutrition by mouth and that sometimes "they don't ever really absorb them."

Respondent foster mother testified that she and her husband specialized in foster care of special needs children. It is evident from her testimony that C.G.L. has required constant, around-the-clock care, during the bulk of the time that he has spent with his foster parents. This required altruistic sacrifices by the foster parents. She testified that the child "eats a tremendous—He eats more food a day than I do. He eats a tremendous amount of food." Additionally, his diet had to be supplemented with "PediaSure," a nutritional drink. She described that in the current eating cycle that the child "wakes up at 1:30 for a cup and he'll wake up again between 5:00 and 6:00 for a cup."

Furthermore, she related that the child's bowel movements were "very odor-some" and that he "passes gas constantly that smells just like the bowel movements." She opined that "his body doesn't have time to deal with the food as it's going through." She related that he passes a "[t]remendous volume" of fecal matter when he has a bowel movement. She stated, "[w]e are potty-training him and I have literally seen him fill a potty chair in one sitting. Get up and within thirty minutes go back and pretty much do the same thing." Furthermore, she stated, "[t]here's no consistency to it . . . [i]t's still very soft formed bowels . . . [o]ne minute—[a]ctually, through a bowel movement he can go from a formed bowel to diarrhea in one bowel movement as—as he goes." She also related:

It's important to know how much he's taking in and how much is coming out. We really have to pay attention to how many times a day he's moving his bowels. [sic] because if there were problems he would either stop going or go too much and so we really have to watch the amounts and how often.

Respondent foster mother also related that the child was in constant risk of dehydration and that he "constantly carries a cup with him." She also testified that after many months he now is being fed by mouth without the assistance of a machine but that his condition could revert.

The record also reveals that Dr. Wess Baugh, a licensed psychologist, testified that he had performed a bonding assessment relating to the child in July of 1999 when he was yet an infant and again on January 3, 2001, when he was a toddler. He explained that a bonding assessment was basically an assessment as to whether a bond had developed between a child and its prospective parent(s). He related that "its being bonded that gives a child a sense of security and confidence with regard to exploring their environment, going out and experiencing new things, feeling like there's a home base, a port of refuge in the storm to come home to and so it's absolutely crucial that a child have that." He determined after his visits that the child had "a very, very strong bond" with his foster parents. Dr. Baugh related that "in every way that I could assess via my interviews, assessment and observation, that this child feels like these two people are his significant others." He opined that if a child were to be taken away from the people he viewed as his primary caretakers that "there is going to be incredible separation anxiety" as manifested in "[c]rying, nightmares, signs of insecurity and anxiety, possible depression . . . [which] leave a child feeling lethargic, hopeless, crying a lot." In response to the question, whether the child would be at risk for developing separation anxiety were he to be separated from his foster parents, Dr. Baugh responded, "[c]onsidering the fact that he's been with them in their home for 24 of the last 27 months, yes, I do," and acknowledged that it would be unwise to separate the child from his foster parents and that the best interest of the child would be served in finalizing the adoption with his foster parents.

We observe that the juvenile court determined:

Considering the requests of the biological parents, the extraordinary needs of the child, the certainty of emotional trauma if custody were to be transferred, the significant bonding and attachment that has developed between the child and [Respondents], the recommendations of the [Guardian Ad Litem] and D.F.S., and the overall best interests of the child, this Court concludes good cause exists to deviate from the

adoptive placement preferences set forth in § 1915 of the ICWA.

In reviewing the record and the judgment of the juvenile court, it is clear that due consideration was given to the guidelines attendant to the factors set out in the ICWA. We cannot say that the juvenile court erred in reaching its conclusion, and we find that the evidence supports the judgment of the juvenile court. *See L.G. v. State, Dept. of Health & Soc. Serv.,* 14 P.3d at 950, 955–56; *People ex rel. A.N.W.,* 976 P.2d 365, 369–70 (Colo.App.1999); *In re Baby Boy Doe,* 127 Idaho 452, 902 P.2d 477, 487 (1995). Point denied.

The judgment is affirmed.

SHRUM, P.J. and MONTGOMERY, J., concur.