108 S.W.3d 669 (2002)
In the Matter of C.D.G. and D.S.G. Minors,
D.F. and P.F., Appellants,
v.
C.D. and K.D., Respondents,
v.
Division of Family Services, Defendant.
No. WD 61293.
Missouri Court of Appeals, Western District.
November 5, 2002.
*671 David Slaby, Nevada, for Appellants.
Melanie Weaver, Clinton, for Minors.
Jeffrey Leon Dull, Windsor, for Respondent.
RONALD R. HOLLIGER, Judge.
Foster parents D.F. and P.F. ("Foster Parents") appeal the trial court's judgment denying their petition for adoption of two minor children (C.D.G. and D.S.G.) and its order granting temporary custody of the children to the children's maternal grandparents, C.D. and K.D. ("Grandparents"), for subsequent adoption. They contend that the trial court misapplied § 453.070.7, that the judgment was against the weight of the evidence, and that the trial judge should have recused himself. Finding no error in the proceedings below, we affirm.

*672 FACTUAL AND PROCEDURAL HISTORY
The children, D.S.G. and C.D.G., were born on October 2, 1998, and on January 6, 2000, respectively. Their mother is the adopted daughter of respondent grandparents. Mother has a history of psychological difficulties, including being diagnosed as bipolar. She had been institutionalized on at least one occasion in the past. The biological father had a criminal history including an offense involving inappropriate sexual contact with a child under the age of three. The Bates County Juvenile Officer removed the children from the biological parents' custody due to abuse and severe neglect on October 3, 2000. That evening, the children were placed in the custody of the foster parents as an emergency placement. Reunification with the biological parents was later attempted but was unsuccessful.
Both biological parents' parental rights to the children were terminated by a judgment entered October 24, 2001.
Prior to the conclusion of the termination proceedings, the Grandparents and the Foster Parents filed separate petitions for temporary custody and adoption. Grandparents' petition was filed on September 27, 2001. Foster Parents' petition was filed on October 3, 2001. Both cases were consolidated for purposes of trial and appeal.
By the time of trial, the children had been in Foster Parents' custody for approximately eighteen months. In May 2001, the children were diagnosed as suffering from reactive attachment disorder (RAD), with D.S.G. suffering from the disorder to a greater degree than C.D.G. This disorder manifests as an impairment in a child's ability to trust and bond with parents and other family members. Starting in August of that year, the children were provided therapy by a psychologist in an attempt to treat the disorder. D.S.G. has also been diagnosed with a moderate language and physiological disorder, but speech therapy had not been initiated yet.
The children thrived during the time the Foster Parents had custody of them, learning to walk, to eat with utensils and being potty trained. Foster parents allege that the children bonded with them and their other children.
Grandparents received visitation with the children while both the juvenile case and the adoption proceeding were pending. The length and conditions of that visitation varied over that time. During the juvenile case, Grandparents' visitation was curtailed because of friction between them and the biological parents, which DFS believed was a barrier to reunification. Later in the case, longer, unsupervised visitation was permitted between Grandparents and the children. Evidence was presented at trial that the children had bonded with Grandparents, as well as their half-siblings and other relatives who visited on a regular basis.
The trial court heard evidence on both petitions on several days in late March and early April 2002. At trial, both DFS and the guardian ad litem recommended that the children remain with the Foster Parents for adoption by them. At the conclusion of trial, the trial court denied Foster Parents' petition for adoption and granted Grandparents' motion for temporary custody. The present appeal follows.[1]

*673 FOSTER PARENTS' CIRCUMSTANCES
Foster father was forty years of age at the time of trial. He is employed by the Dairy Farmers of America, driving a milk truck. His work schedule involves working approximately thirty-five hours each weekend, and he is usually free during the week. He has a tenth-grade education. Mother is thirty-six years old. She was once employed, but is now a stay-at-home homemaker. The couple has been married for twenty years.
At the time of trial, Foster Parents were caring for five children, in addition to the two children at issue in this case. Many of the children are in their teens, with the eldest being seventeen at the time of trial. Foster Parents also cared for several other foster children in the time they have had custody of the children at issue in this proceeding.[2]
Foster Parents' income is approximately $54,000 per year. A substantial portion of that income is from adoption subsidies and the foster care services they provide to DFS.[3] Insurance for the children would be provided through the state MC+ program.
Foster Parents live in a sixteen by eighty foot trailer, with six bedrooms and four bathrooms. Each of the children at issue in this proceeding share bedrooms with other children in the home. At the time of trial, plans were being made to construct a family room addition onto the trailer. The trailer is located on 95 acres of land near Rich Hill, Missouri.

GRANDPARENTS' CIRCUMSTANCES
Grandparents are not presently caring for any other children. Grandfather is sixty years old, and owns three used-car lots. He is actively involved in the day-to-day operation of only one of those lots, however. Grandmother is forty-eight years old, and assists with the paper/computer side of the business. Her work responsibilities are flexible and can be carried out either at the business or at home. She also testified that she is willing and able to cease working if necessary to properly take care of the children.
Grandparents' annual income drawn from their automobile sales business is approximately $61,200. Their car lots contain inventory that is valued at approximately one million dollars. Both have health insurance through the business, and they would be able to provide private insurance for the children. Grandparents also testified that there was adequate income to provide for the children's future college expenses and that there would be opportunities for them to become involved in the family business, should that be their inclination.
While the case was pending, Grandparents moved into a new 6,100 square-foot residence with five bedrooms and four bathrooms. Prior to that time, they were living at a residence located at one of their car lots. The living space is still available for use, and has an area behind it where the children can play, making it possible for the children to accompany Grandparents to the business and still have the amenities of a home environment.

*674 STANDARD OF REVIEW
As with any child custody proceeding, the paramount goal in an adoption proceeding is the best interests of the child. In re Drew, 637 S.W.2d 772, 778 (Mo.App.1982). We give greater deference to the trial court's determinations of credibility than in other civil cases. In re J.L.H., 647 S.W.2d 852 (Mo.App.1983). Generally, we will not disturb the judgment below unless the welfare of the child requires another disposition. Id. As the central goal of the proceeding is to promote the best interests of the child, "a greater burden is imposed on the trial court than simply according all parties a fair trial." Matter of Williams, 672 S.W.2d 394, 395 (Mo.App.1984).
We will affirm the judgment below, unless the judgment has no substantial evidence to support it, the judgment is against the weight of the evidence, or the trial court erroneously declared or applied the law. Matter of B.S.R., 965 S.W.2d 444, 448 (Mo.App.1998). Generally, we will defer to the trial court's exercise of its discretion, unless that discretion is abused. An abuse of discretion may be found only when the trial court's decision "is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Waisblum v. Waisblum, 968 S.W.2d 753, 755 (Mo.App.1998).

DISCUSSION
Foster Parents present three points on appeal. First, they contend that the trial court erred in denying their petition for adoption and granting Grandparents' petition for temporary custody by disregarding § 453.070.7, RSMo. That statute provides that the trial court is to give preference for adoptive placement to foster parents who have had custody of a prospective adoptive child for more than nine months. Second, Foster Parents argue that the trial court erred in denying their petition and granting Grandparents' petition on the grounds that the trial court's decision was against the weight of the evidence. Third, Foster Parents allege that the trial judge's comments at the conclusion of trial established that the judge was improperly biased in favor of Grandparents and erred in failing to recuse himself.
Did the Trial Court Misapply § 453.070.7, RSMo?
Foster Parents' first point on appeal contends that the trial court erred by misapplying the provisions of § 453.070.7, RSMo. Section 453.070 states, in relevant part:
453.070. Investigation, prerequisite to decree of adoptioncontents of investigative reportsmakersrules and regulationssubmission prior to hearingwaiver of investigation, whenfeesfoster parents, placement, preference and first consideration, discretion of court
* * *
7. Any adult person or persons over the age of eighteen, who, as foster parent or parents, have cared for a foster child continuously for a period of nine[4] months or more and bonding has occurred as evidenced by the positive emotional and physical interaction between the foster parent and child, may apply to such authorized agency for the placement of such child with them for the *675 purpose of adoption if the child is eligible for adoption. The agency and court shall give preference and first consideration for adoptive placements to foster parents. However, the final determination of the propriety of the adoption of such foster child shall be within the sole discretion of the court.
Id. (emphasis added). The issue before the court is the proper interpretation and application of the "preference and first consideration" language in subsection 7.
As Foster Parents had physical custody of the children for more than nine months prior to the hearing, they contend in their brief that this subsection creates a presumption that their petition for adoption should have been granted. However, in oral argument counsel for Foster Parents conceded that the term preference is not synonymous with the term presumption and particularly with the legal meaning of presumption. Neither party has benefited us with any principles of statutory construction nor legislative history of this subsection. Instead, Foster Parents' argument focuses exclusively upon the degree of bonding between Foster Parents and the children. Grandparents argue that the statute does not create a presumption, but instead merely sets up a factor to be considered in the trial court's best interests analysis. As with Foster Parents' brief, Grandparents advance no statutory interpretation argument for the court's consideration, focusing instead on the particular facts of the case.
In addition to the general rules of statutory construction, Chapter 453 contains its own construction directive. "The provisions of sections 453.010 to 453.400 shall be construed so as to promote the best interests and welfare of the child in recognition of the entitlement of the child to a permanent and stable home." § 453.005, RSMo 2000.[5] Chapter 453 constitutes a complete code and its various provisions should be construed together. In re Adoption of Smith, 314 S.W.2d 464, 466 (Mo.App.1958).
The meaning of a word in a statute depends to some extent on the context in which it is used. L.C. Development Co., Inc. v. Lincoln County, 26 S.W.3d 336, 340 (Mo.App.2000). Likewise, a section of a statute must not be read in isolation from the context of the enactment. State v. Rousseau, 34 S.W.3d 254, 260 (Mo.App.2000).
Our ultimate goal is to ascertain the intent of the legislature from the language used giving it, where possible, its plain and ordinary meaning. Preston v. State, 33 S.W.3d 574, 578 (Mo.App.2000). One additional principle must be kept in mind given the legislative history of § 453.070. Prior to 1997, subsection 7 (then numbered subsection 5) required only agencies authorized to place children for adoption to give "preference and first consideration" to foster parents.[6] By amendment in that year the words "and court" were inserted after the term "agency." Thus, we must interpret subsection 7 additionally with the principle in mind that the legislature intended some effect and in a manner that it not be a meaningless act. State ex rel. Director of Revenue v. Gaertner, 32 S.W.3d 564, 567 (Mo.2000).
And, finally, we must presume that the legislature is aware of both its other enactments and the court's interpretation of the law. Before the 1997 amendment even though an agency was instructed to give *676 "preference and first consideration" to foster parents the next sentence of § 453.060(5) provided: "However, the final determination of the propriety of the adoption of such children shall be within the sole discretion of the court." (emphasis added). Presumably, the legislature was well aware of the decisions of the courts addressing adoption decisions to the wise discretion of trial courts following the lodestar of the child's best interests and welfare. See § 453.005, RSMo; In re Drew, 637 S.W.2d at 778. The legislature in the 1997 amendment adding the words "and court" left intact the final sentence committing the propriety of adoption proceedings to the court's discretion. It thus seems clear that whatever the legislature intended by its amendment that intent was not to restrict the court's ultimate discretion as previously enacted and as confirmed by the appellate courts.
A view of the overall structure and procedures of Chapter 453 supports this view. Child placing agencies, of course, have no legal power to approve or disapprove of adoptions. That power is vested in the courts. The agencies may place a child with a family for adoption, but that placement requires approval of the court. § 453.110, RSMo. "Placement" although not a defined term in Chapter 453 does carry a particularized meaning referring to the transfer of custody to prospective parents for the purpose of future adoption. Subsection 7, in fact, provides for foster parents under the specified conditions "may apply to such agency for the placement of such child with them for the purpose of adoption."
Other provisions of Chapter 453 also indicate that "placement" is essentially the first step in the adoption process. For example, § 453.077, RSMo, requires post-placement assessments before a final decree of adoption. In addition, even foster parents who have had custody of a child subject to a Chapter 211 proceeding for at least six months, pursuant to a custody order, must have another post-placement period of custody after placement for adoption unless the trial court waives that requirement. § 453.080.1(1), RSMo 2001.
The phrase "agency and court" in subsection 7 lends further credence to an interpretation that "preference and first consideration" to foster parents applies at the placement phase of the adoption process and not to the final adoption determination.[7] An agency, of course, has no power to give or withhold a preference as to the propriety of final adoption. That is a power delegated to the court in its sole discretion by the same subsection 7.
We, therefore, hold that the preference and first consideration language of subsection 7 is limited to the placement for purposes of adoption stage, prior to the filing of any adoption proceeding. When an actual adoption proceeding is filed, whether contested or not, the test for determining whether the adoption should be granted is simply the best interests of the child, a decision which lies in the sound discretion of the trial court. The trial court, therefore, did not erroneously declare or apply the law by not giving a preference to the foster parents in this contested adoption action.
Was the Trial Court's Decision Against the Weight of the Evidence?
Foster Parents argue that the trial court's denial of their petition for adoption and the granting of Grandparents' petition *677 for temporary custody was against the weight of the evidence.
As stated above, the primary goal in adoption cases is the best interests of the child. See In re Drew, 637 S.W.2d 772, 778 (Mo.App.1982). There are innumerable factors that may be considered in determining whether an adoptive placement is in the children's best interests. See In re L.W.F., 818 S.W.2d 727, 734 (Mo.App. 1991). With the possible exception of a strong negative factor, no one factor is determinative of the issue. Id. As such, the best-interests analysis is very fact-intensive and may turn on very subtle factors.
Nearly all of the evidence presented at trial tended to show that both prospective adoptive couples were well-suited to adopt the children. The evidence tended to show that both homes would be excellent adoptive placements. The trial court commented that each couple was "about equal" in terms of their adoptive suitability.
This does not mean that each couple was equally matched in every respect, however. There were clear differences between the couples. First, there was a significant (more than $7,000) difference in annual income between the two couples. Second, there were also substantial differences in the nature of that income. Third, the size and nature of the respective family homes was substantially different. Fourth, the homes had different numbers of other children residing in the home, which impacts the parents' ability to provide individual attention to the children. Fifth, each couple also has different levels of experience regarding children or young adults with bipolar disorder, which the children are at risk of inheriting. These factors tend to weigh more strongly in favor of Grandparents.
Other factors tend to weigh in favor of adoptive placement with Foster Parents. First is the degree of contact and bonding between the children and the adoptive couples. Foster Parents had physical custody of the children for eighteen months prior to trial, well beyond the nine-month period which triggers the preference discussed in § 453.070.7, RSMo. Grandparents had intermittent visits during that time. While there was no evidence clearly comparing the degree of bonding between the children and each couple, but the children obviously spent the overwhelming portion of their time with Foster Parents. Second is the degree of training received by the couples. The Foster Parents regularly attend training and classes provided by DFS, and have even been involved as instructors. Grandparents completed coursework to become licensed for relative foster care placement. They also have background and experience with bipolar disorder, through their experience raising the children's mother and the therapy and counseling that was provided to the family. Third is the difference in ages between the couples, as the Foster Parents were significantly younger than Grandparents.
Another factor that was obviously significant to the court was the biological relationship connection between the children and Grandparents. Foster Parents are correct in pointing out that there is no preference for adoptive placement with biological relatives. In re K.K.J., 984 S.W.2d 548, 554 (Mo.App.1999). While there is no preference, such relationships are nevertheless significant considerations in evaluating what is in a child's best interest. In some cases that biological relationship weighs in favor of the child's best interest. In others, that biological relationship could hinder or impair the child's best interest. See, e.g., In re M.D.H., 595 S.W.2d 448, 451 (Mo.App.1980). Here, the *678 evidence tended to show that the family relationship was strongly positive.
During the trial, there was some testimony that attacked Grandmother's ability to nurture the children. That evidence, however, chiefly concerned Grandmother's demeanor during meetings between DFS and the parents shortly after the children were taken into DFS custody and the friction between her and DFS over the history of the case. The trial court found that Grandmother's behavior was understandable under the circumstances, given DFS' perceived resistance in permitting Grandparents contact and visitation with the children.
There was also testimony offered by the DFS social worker regarding her observation of Grandmother's interaction with the children that suggested that Grandmother was less nurturing. Those observations, however, were made upon the basis of having only observed three brief visitations in an office setting. Her testimony was not consistent with the testimony of the experts who testified on the subject, who concluded that Grandmother was properly nurturing towards the children. As such, the trial court could have readily concluded that the DFS worker's testimony was not credible.
Viewing the evidence and testimony before the trial court, we disagree with Foster Parents that the trial court's decision was against the weight of the evidence. Instead, we conclude that there is substantial evidence which supports the trial court's judgment. Point denied. Was the Trial Judge Required to Recuse Himself Due to Bias?
For their final point on appeal, Foster Parents argue that the trial judge should have recused himself on the basis of comments made by the judge in announcing his decision. Foster Parents argue the comments showed that he had prejudged the case and had a bias in favor of Grandparents. No motion or request to recuse was made.
The Code of Judicial Conduct requires a judge to recusal in a proceeding in which that judge's impartiality might be reasonably questioned. See Rule 2.03, Canon 3(E)(1). The threshold for triggering that duty is crossed if a reasonable person would have factual grounds to believe to be dubious of the impartiality of the judge. Berry v. Berry, 654 S.W.2d 155, 164 (Mo.App.1983). Actual proof of bias or impartiality need not be shown. Id.
While Foster Parents do not identify a specific subsection of Canon 3(E)(1) under which their claim is marshaled, it appears that it is premised upon Canon 3(E)(1)(a), dealing with personal biases or prejudice regarding a party or a party's lawyer, and a judge's personal knowledge of disputed evidentiary facts.
"[A] judge is entitled to the presumption that he will not undertake to preside in a trial in which he cannot be impartial." Blando v. Reid, 886 S.W.2d 60, 65 (Mo.App.1994). Prejudice is a mental attitude against a party or in favor of the party's adversary. Id. at 64. Bias and prejudice must flow from an extra-judicial source to be disqualifying. Id. Attitudes regarding the law or a party's conduct do not constitute prejudice against a party. Id.
Typically, a motion for change of judge is required before a party may appeal a trial judge's refusal to recuse himself or herself from the case. Rule 51.05. In circumstances such as this one, where the statements that allegedly showed bias were made as part of the oral pronouncement of the court's decision, then this court has permitted a party to raise the *679 issue for the first time on appeal. Buschardt v. Jones, 998 S.W.2d 791, 802 (Mo. App.1999). We will, therefore, take up the merits of Foster Parent's point on appeal, despite the fact that there was no motion for new trial and change of judge filed in the proceedings below.
The parties did not request written findings of fact or conclusions of law. In announcing his decision at the close of trial, however, the trial court articulated some of the background and basis for his decision. From those comments, Foster Parents point to three passages that, they allege, show the trial court was biased in favor of Grandparents.
The Court is aware that early on the [Grandparents] asked for custody, asked for visitation, and primarily through conduct of the Court in postponing the hearings on those motions they did not receive [that] custody, they did not receive that visitation. At one point their visitation was restricted, and I think I did that, and I think I probably knee-jerked a little bit, may have stopped that visitation at a time when I shouldn't have.
* * *
I think that we put you in a catch 22 situation in that we didn't let you have the kids. Then we said because you haven't had the kids, you can't have the kids. Well, these things by nature have got to take time. Nobody knew that the termination proceeding was going to take as long as it did. Then at that time you had the only petition on file and I assumed that we were going to turn around and hear it. So I still didn't rule on the [motion] for custody that had been filed by Mr. Dull at that time because I thought we were going to hear it all at once. Then here comes the other petition and here we are a year later doing what we should [have] done a year ago.
* * *
I have my own personal belief, and one of the reasons I ruled the way I did is I believe that family should take care of family and I believe [that] family can take care of family. I think that everything else is equal about them.
Foster Parents correctly point out that the trial judge's statements must be viewed "in the context of all statements of the judge and of the circumstances before the trial judge when the statements were made." Haynes v. State, 937 S.W.2d 199, 204 (Mo. banc 1996).
In the first two passages, the trial court was merely expressing the history of the case and the prior juvenile and termination of parental rights proceedings that the trial court had heard. From the record before us, it appears that the trial judge's comments in that regard were an accurate recounting of that history and of the problems and obstacles that process posed to Grandparents. They do not establish that the trial court had prejudged the case or was biased in favor of Grandparents. Indeed, had the trial court been biased in favor of Grandparents from the outset, Grandparents would have been accorded more regular visitation with the children or even granted custody of the children at an earlier stage of the proceedings.
This takes us to the third statement by the trial court. Foster Parents contend that this statement establishes that the trial court decided the case merely upon the biological relationship between the children and Grandparents. We disagree. First, the trial judge's statement indicates that the family relationship was only one of the reasons for his decision. He did not state that it was the sole factor upon which *680 his decision was premised. As discussed previously, the biological relationship between a child and the prospective adoptive parents is an appropriate, and sometimes significant, factor in determining whether the adoption is in the child's best interests. While Foster Parents might differ regarding the legal weight to be given that factor, that is a difference that concerns, attitudes about the law, and such attitudes, as stated above do not constitute prejudice regarding a party.
Foster Parents also focus upon the trial court's comment that the couples were "about equal" in terms of adoptive suitability. Some of the arguments made in their other two points on appeal suggest that, all other things being equal, the Foster Parents should have prevailed due to the preference provided by § 453.070.7, RSMo. As we have previously discussed, there is no statutory preference that the trial court was required to consider. There is no indication that the trial court was biased in favor of Grandparents, or otherwise prejudged the matter. Point denied.

Conclusion
In this matter, the trial court was faced with the difficult decision of deciding between two adoptive couples who were well-suited to adopt the children at issue. Each set of couples had strengths or advantages the other did not. After reviewing the record, we conclude that the trial court correctly applied the law, fairly weighed the evidence without bias or prejudice against either party, and rendered a decision that was within the court's discretion based upon the evidence adduced. His decision was not a finding that Foster Parents were unsuitable as adoptive parents, but rather that Grandparents were better situated and suited to care for the children and that placing the children with Grandparents for adoption was in the children's best interests.
Finding no error in the proceedings below, we affirm the judgments of the trial court denying Foster Parents' petition for adoption and granting Grandparents' petition for temporary custody.
JAMES M. SMART, Presiding Judge, and ROBERT G. ULRICH, Judge, concur.
NOTES
[1] A judgment granting temporary custody for purposes of adoption, while interlocutory in nature, is final for purposes of appeal when it is paired with a judgment denying a competing petition for adoption. See In re M.F., 1 S.W.3d 524, 538 (Mo.App.1999).
[2] While not raised by the parties, there may be a question of whether placement of additional foster children with Foster Parents was inconsistent with 13 C.S.R. 40-60.020(1), which limits the number of any children in any foster home to six, with certain exceptions for foster sibling groups.
[3] Though this issue was not discussed in the record, it would appear that if Foster Parents were permitted to adopt, they would no longer be able to accept further foster care placements due to 13 C.S.R. 40-60.020(1).
[4] Prior to amendment of the statute in 2001, the statute provided a twelve-month period. The effective date of the amendment reducing the period to nine months was August 28, 2001.
[5] All statutory references are to RSMo 2000, unless otherwise indicated.
[6] Section 453.014, RSMo, specifies those individuals or entities who may place children for adoption. A court is not such an agency.
[7] Of course, as a practical matter, if a child is placed for adoption purposes with a foster parent and does well, that factor would weigh heavily at the final adoption hearing.