**In re the ADOPTION OF T.J.D., J.W.G., S.D., and W.D.D., Minors,**

**P.W.J. and P.G.J., Respondents,**

v.

**S.R.G., Appellant.**

**No. 26828.**

Missouri Court of Appeals,
Southern District,
Division Two.

March 23, 2006.

Wendy E. Garrison, Twibell, Johnson, Johnson & Garrison, Springfield, MO, for appellant.

Jerry E. Holcomb, Collins, Webster and Rouse, P.C., Joplin, MO, for respondents.

Before SHRUM, P.J., GARRISON and BARNEY, JJ.

PER CURIAM.

S.R.G. ("Grandfather") filed a petition seeking to adopt four of his minor grandchildren. P.W.J. and P.G.J. ("Foster Parents"), a married couple who had provided foster care for the children, also filed a petition for adoption. The two cases were consolidated for trial. The juvenile division of the Jasper County circuit court ("Juvenile Court") entered judgment favorable to Foster Parents, i.e., it decreed adoption of the four children by Foster Parents. Grandfather appeals. He urges reversal by claiming the judgment is against the weight of the evidence and was entered in violation of a local circuit court rule. We affirm.

## STANDARD OF REVIEW

"As with any child custody proceeding, the paramount goal in an adoption proceeding is the best interests of the child." *In re C.D.G.*, 108 S.W.3d 669, 674[2] (Mo.App.2002). "As the central goal of the proceeding is to promote the best interests of the child, 'a greater burden is imposed on the trial court than simply according all parties a fair trial.'" *Id.* at 674[5] (quoting *Matter of Williams*, 672 S.W.2d 394, 395 (Mo.App.1984)).

In reviewing adoption cases, the well-known standards of *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976), govern. *In re C.G.L.*, 63 S.W.3d 693, 696 (Mo.App. 2002). "The judgment of the juvenile court must be upheld unless there is no evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* at 696[1].

[4, 5] In making this determination, we accept as true all evidence and inferences that are favorable to the Juvenile Court's decision while disregarding all contrary evidence and inferences. *In re Adoption of J—G—L—, Jr.*, 853 S.W.2d 433, 436[3] (Mo.App.1993). Moreover, we are "mindful that a trial court is free to believe or disbelieve all, part or none of the testimony of any witness." *Id.*

## FACTS

K.D. and S.G. are the birth parents of the four children involved in this suit. The children are as follows: (1) T.J.D., a son born March 15, 1998; (2) J.W.G., a son born December 18, 1999; (3) S.D., a daughter born September 23, 2001; and (4) W.D.D., a son born August 3, 2002.

The Children's Division of the Department of Social Services ("DSS") first became involved with the family in February 2001.

At that time, DSS received a "call of concern" regarding the family (K.D., S.G., T.J.D., and J.W.G.) because the parents were involved in a domestic dispute. A DSS investigation revealed "the home to be littered with trash, dirty clothes, and no bedding for the one mattress the family slept on." Later, on separate dates, two additional domestic disturbance calls involving K.D. and S.G. were received by the Joplin police department. The officer who responded to the April 23, 2001, call contacted DSS "due to the living conditions in the house," namely: "There was food and trash all over the floor. The kitchen floor had some kind of slippery substance all over it. The toilet had a strong odor of urine and looked like it hadn't been flushed in a while. [S.G.] said they hadn't had running water for 4 days."

On April 26, 2001, DSS again inspected the residence. It found the unsanitary conditions largely unchanged and drug paraphernalia in the parents' room. The next day, the juvenile officer successfully petitioned the Juvenile Court for protective custody of T.J.D. and J.W.G. In May 2001, a case plan was adopted for reunification of the family with specific goals set for K.D. and S.G. such as maintaining suitable housing and demonstrating an ability to keep it "clean and safe," addressing the domestic violence issues, drug counseling for K.D., and prenatal treatment for S.G. who was pregnant with S.D.

By August 2001, the couple still had not complied with DSS requirements. A drug screening was scheduled for K.D. and S.G. on August 23, 2001, but neither completed the test. In September 2001, a third child, S.D., was born and immediately taken into protective custody.

A dispositional hearing was held in February 2002. The result was an order that left the children in DSS's custody. At that time, DSS asked that visitation between the children and K.D. and S.G. cease until negative drug tests were returned by the parents. Both refused to comply with any testing.

Grandfather then wrote to the Juvenile Court on March 16, 2002, and asked that it consider granting him custody of the subject children.[1] In June 2002, Grandfather (who had been living in Colorado) moved to the Joplin area. He made this move because he anticipated he could more quickly gain custody of his grandchildren if he lived in Missouri. Despite his asserted desire to have custody, Grandfather filed a motion with the Juvenile Court on June 25, 2002, in which he asked the court to reunite the children with K.D. and S.G. The court denied that request.

On the next day (June 26), S.G. tested positive for methamphetamine. At the time, she was pregnant with her fourth child. A July 18, 2002, report to the Juvenile Court by the juvenile officer contained information that showed K.D. and S.G. had no real interest in regaining custody of the children as they had failed to rectify any of the conditions which led to the children being placed in DSS custody. This situation did not improve as evidenced by the fact that K.D. was arrested for methamphetamine possession in September 2002.

S.G. gave birth to her fourth child, W.D.D., on August 31, 2002. At some point—an exact date is not fully disclosed by the record—K.D. and S.G. moved to Kansas to prevent removal of W.D.D. from their custody.

1. Grandfather is S.G.'s biological father.

On April 22, 2003, DSS placed physical custody of the three older children with Grandfather. Later, in December 2003, S.G. left her youngest child (W.D.D.) with Grandfather because of her impending arrest in Kansas on drug and child endangerment charges. The December events are summed up in a DSS report:

"On December 30, 2003, a report was faxed to this office from Kansas SRS.... This report states that [K.D.] was arrested on December 22, 2003. K.D. was found to be in a vehicle and was charged with possession of methamphetamine and ephedrine tablets. A drug raid was conducted at the residence of [K.D. and S.G.], following the raid, charges were filed against S.G. and K.D. for Child Endangerment, Possession of Marijuana, Drug Paraphernalia, Meth, Ephedrine, and Manufacturing a Controlled Substance. The police have taken video and photographs of the residence. The police report also states that the officer found the home to be 'the filthiest home he's ever seen.' The home had garbage poured out everywhere, dirty diapers, rotten food everywhere, refrigerator full of rotten food and non-edible food. The house utilities are about to be shut off and the only source of heat was a portable space heater."

Once the Juvenile Court learned W.D.D. was in Missouri, it assumed jurisdiction and ordered him into the custody of DSS. It then placed W.D.D. in Grandfather's home. This occurred December 31, 2003.

Before the December events, Grandfather had filed a written request that the two oldest children be returned to K.D. and S.G. His asserted reason was that "they [had been] removed for the wrong reason." According to a March 3, 2004, report by the DSS, this request was "heard in November 2003." Whether the court ever ruled that motion is unclear. What is clear, however, is that the court never ordered the return of the children to their parents. Also, the March 3 report noted that despite S.G.'s and K.D.'s history of drug usage and drug offense arrests (including the December 2003 incidents), Grandfather "did not believe the parents were involved with the meth lab and disagreed that [S.G.] was using drugs." This document also revealed that when W.D.D. was placed with Grandfather on December 31, 2003, he (Grandfather) was told he should not allow any contact between the children and their parents. This was not a DSS decision. The Juvenile Court had ordered DSS to "cease visitation between children and natural parents." However, Grandfather failed to heed DSS's warning or obey the court's order. Again referring to the March 3 report, the DSS worker asserted that although K.D. and S.G. had a string of arrests in January and February 2004 for drug offenses and other crimes, Grandfather continued to allow contact between the children and the parents.[2] Because of this and other problems, the DSS workers concluded their March 3 report with a recommendation that the placement

---

**2.** Grandfather's attitude about this is exemplified by his comments found in an adoption study dated February 16, 2004. There he was quoted as saying:

"Since the parents had done nothing to physically or emotionally damage the children, I will allow contact and I am determined to have the children strengthen their connections with other family members back in Colorado once the court permits us to leave this place. Bureaucratic demigods tried to sever the connections between the children and the family; in fact, they tried to sever the bonds between the children, which I will never allow."

of the four children with Grandfather be terminated.[3]

The record reflects that before DSS completed its March 3 written report, it had given the Juvenile Court an oral report to the same effect as the written report. Based on the oral report, the Juvenile Court had terminated its placement of the children with Grandfather by order dated March 1, 2004, and ordered them into foster care. The DSS then placed the children in the Foster Parents' home.

The Juvenile Court terminated K.D.'s and S.G.'s parental rights to all four children in October 2004. By that date, Grandfather and Foster Parents had filed competing petitions seeking to adopt the children. The adoption cases were consolidated and the adoption trial was held January 6, 2005, with the honorable Judge David C. Dally presiding. Evidence presented at the adoption trial revealed that the children thrived after reaching the Foster Parents' home. For instance, T.J.D.'s teacher testified to positive changes she saw in T.J.D. once he was removed from Grandfather's custody:

> "Immediately he was more well groomed. He was clean, his hair was cut, he always had his glasses, they were clean. He wore pants that fit, he had his pants buttoned. After a while the Pull-ups stopped, he didn't have any more accidents at school. And his general level of emotional stability seemed to level out. It wasn't immediate; it was after a few weeks. He did not seem depressed to me anymore."

There was also testimony that Grandfather provided little structure for the children. To illustrate, a DSS contractor described Grandfather's visits with the children as "pretty chaotic the whole time." Another observation was that Grandfather sometimes gave the children "direction" but never followed through with his commands. As an example, Grandfather consistently let T.J.D. and J.W.G. come and go from the room as they pleased.

On the other hand, there was evidence that the Foster Parents are a two-parent family who provided excellent structure for the children. On Sundays, the family attended church twice. During the week, sports activities provided the children with additional structure. Each day after school, the children had a specific schedule to do homework and were helped by the Foster Parents. The children either read or were read to on Monday through Thursday evenings. Each night when the children went to bed, the family followed a specific schedule and ritual.

At the conclusion of the hearing, the court took the matter under advisement. On January 12, 2005, a docket entry by Judge Dally recited that it would be in the best interests of the children to grant the adoption request of the Foster Parents. A "judgment and decree of adoption" was then entered on January 21, 2005.

In its judgment, the Juvenile Court found, *inter alia,* the following: (1) since March, strong emotional bonds had developed between the children and the Foster Parents; (2) the Foster Parents had a positive home and a positive track record as foster parents; (3) they were a two-parent family with extensive ties to the community, they were both gainfully employed, and they were active in church and sports with the children; (4) Grandfather did not have a positive home study or recommendation for consideration as a placement from DSS; and (5) Grandfather

---

**3.** This recommendation came not only from DSS workers, but was the recommendation of the team, i.e., deputy juvenile officer, the children's guardian ad litem, *and* DSS.

intended to continue to allow contact between the children and the birth parents.

The judgment, however, was not signed by Judge Dally. Pursuant to a local circuit court rule, Judge Jon Dermott signed the judgment "acting in the absence of Judge Dally." This appeal by Grandfather followed.

### Point I: Sufficiency of the Evidence

■ We reproduce Grandfather's first point verbatim. We do so to show that it is difficult to discern what Grandfather claims as reversible error. His point relied on reads:

> "The trial court erred in granting the foster parents' petition for adoption and denying the Grandfather's petition for adoption, because it is against the weight of the evidence in that the facts established it would have been in the best interest of the children for the appellant Grandfather to have had his petition for adoption granted."

When we turn to the argument part of the brief for clarification, we find none. To explain, after providing the standard of review, the argument begins as follows:

> "The trial court erred initially when it removed the children from the care of the grandfather in March, 2004, and then failed to return the children after the May 4, 2004, hearing. The action by the court was against the weight of the evidence, and his findings at the May, 2004, hearing were inconsistent with the testimony."

For approximately the next five pages, the argument attempts to demonstrate why the initial removal from Grandfather's custody was erroneous. Inexplicably, however, the argument makes no attempt to show how this alleged error related to the adoption judgment and the court's finding that it was in the children's best interests to be adopted by the Foster Parents.

■ We find Grandfather's first point and argument preserves nothing for appellate review. First, the point itself is utterly deficient in that it is nothing more than a mere abstract conclusion of law. *See In re Q.M.B.*, 85 S.W.3d 654, 660–61 (Mo.App.2002)(similarly styled point relied on). "An insufficient point on appeal preserves nothing for appellate review." *In re P.G.M.*, 149 S.W.3d 507, 512[6] (Mo. App.2004); Rule 84.13(a).[4]

■ More troubling, though, is the fact that the argument section spends considerable time on an issue not raised in the point relied on. This violates Rule 84.04(e).[5] "The only issues required to be determined on appeal are those raised in the points relied on." *Roberts v. Progressive Northwestern Ins. Co.*, 151 S.W.3d 891, 895[2] (Mo.App.2004). "Issues first raised in the argument portion of the brief are not preserved for review." *Id.* at 895[3].

■ Because of these briefing deficiencies, this court would be justified in dismissing Grandfather's first point. However, the futures of four children are at stake. Accordingly, we have reviewed the record *ex gratia* in an effort to address what we can best perceive are Grandfather's complaints about the trial court's decision.

■ As noted earlier, the primary goal for the Juvenile Court in adoption cases is deciding what is in the children's best interests. *C.D.G.*, 108 S.W.3d at 677[13]. Innumerable factors exist that color this determination; as such, the best interests

---

4. Rule 84.13(a) provides that "allegations of error not ... properly briefed shall not be considered in any civil appeal."

5. In part, Rule 84.04(e) provides that "[t]he argument *shall* substantially follow the order of 'Points Relied On.'" (Emphasis added.)

analysis is very fact-intensive and may turn on very subtle factors. *Id.* "With the possible exception of a strong negative factor, no one factor is determinative of the issue." *Id.*

Before addressing factors that negate Grandfather's claims of reversible error, we note there is uncontradicted evidence that convinces us Grandfather deeply loves his grandchildren. Moreover, it is admirable that Grandfather wanted to provide the children with a good home. However, we are convinced he is incapable of doing so. This stems, in part, from his refusal to acknowledge that S.G. and K.D. had serious ongoing drug addictions that had led them into lives of crime and despicable and self-destructive lifestyles. Seemingly, Grandfather's fixation on maintaining contact between the children and their birth parents blinded him to the fact that the children's best interests were not served by that notion. The second problem is Grandfather's lack of parenting skills.

Earlier, we recounted some of the history of how the children came into the custody of DSS. This included evidence that S.G.'s and K.D.'s continuous neglect of their children resulted from their need to satisfy their own personal, criminal desires. Overwhelming evidence exists to convince any unbiased person that S.G. and K.D. were not likely to change. Yet, as is often true in this type of situation, apparently hope sprang eternal in Grandfather that he could help his daughter S.G. and her consort K.D. and, by doing so,

ultimately reunite them with their children. For instance, he provided them with money while at least one of the children went to school unkempt with clothes that did not fit. He housed the children in a two-bedroom house while supporting K.D. and S.G., in part, by providing them a home in Kansas and later at a motel. Even though Grandfather's continuous support for K.D. and S.G. was a principal reason the children were taken from Grandfather in March 2004, he allowed the birth parents to move into his two-bedroom home in June 2004. This occurred during the pendency of his adoption effort and after he had been told that his allowing contact between the children and their parents was another reason why the children were ordered into foster care. These facts tend to show that Grandfather put the best interests of the children aside in his futile effort to help S.G. and K.D. This has been the staple of Grandfather's intent from the beginning of his involvement in the case.

Given what the record shows, Grandfather should not have allowed contact between the birth parents and these children. Yet, the Juvenile Court found that was what Grandfather intended if he was allowed to adopt them.[6] That conclusion is fully supported by this record. Thus, in February of 2004 (one month prior to the removal of the children from his custody), Grandfather voiced his intent that the parents would have continued contact because "the parents had done nothing to physically or emotionally damage the children."

---

**6.** In the argument part of his brief, Grandfather claims this finding was unsupported by competent evidence. He insists that such an intent cannot be inferred from any claim that he allowed the children/parent contact from December 2003 to March 2004 (the relevant period when he was ordered not to allow contact) because such claim was unproven. To support this he says the testimony from DSS workers on this issue was inconsistent.

He then attempts to buttress his argument by pointing to his trial testimony that he had only allowed limited contact with the children, such as at Christmas. Both arguments are answered by pointing out that resolving conflicting evidence was for the juvenile court and it was free to believe or disbelieve *all, part, or none* of the testimony of *any* witness. *J—G—L—, Jr.,* 853 S.W.2d at 436[3].

Moreover, S.G. was present at the adoption trial. The trial court inferred she was there in support of Grandfather's adoption request, which in turn showed that Grandfather still intended to allow birth-parent/children contact. On this record, those were reasonable inferences. Such evidence demonstrated Grandfather's continued failure to recognize the parents' drug problem. It also demonstrated that his stated goal of continued contact between the children and parents outweighed his concern for the well-being of the children and he intended to allow contact with the parents regardless of the children's best interests.

▪ "In some cases [a] biological relationship weighs in favor of the child's best interests. In others, that biological relationship could hinder or impair the child's best interests." *C.D.G.*, 108 S.W.3d at 677. The latter is true here because "[c]oncern about future contacts by a biological parent is a factor that can be considered in denying a grandparent custody." *In re K.K.J.*, 984 S.W.2d 548, 553[5] (Mo.App.1999). In this case, the "future contact with biological parents" factor weighs heavily against Grandfather and favorably to the Foster Parents.

▪ Another negative factor in Grandfather's case is persuasive evidence that he lacked sufficient parenting skills to raise these children. His questionable parenting skills were recounted above and need not be repeated except for this. Insistence on continued future "biological parent/children" contact shows poor parenting judgment. No parent with good parenting skills would allow or encourage continued contact with such destructive forces as K.D. and S.G. In sum, sufficient competent

evidence exists to find that Grandfather could not provide the type of structure and stability that children need in their environments. The Foster Parents can. A good environment with stability and structure is utterly vital to development and a child's best interests. *Hunt v. Hunt*, 65 S.W.3d 572, 575[1] n. 4 (Mo.App.2002); *Seaman v. Seaman*, 41 S.W.3d 889, 895 (Mo.App.2001); *Newsom v. Newsom*, 976 S.W.2d 33, 39[13] (Mo.App.1998).

Further discussion on why the Juvenile Court's best interest finding is supported by sufficient competent evidence is unnecessary. We are persuaded the Foster Parents love the children and have provided them with a good, stable home where they are thriving. Any factors favorable to Grandfather's adoption effort do not outweigh the factors favorable to adoption of the children by the Foster Parents. Grandfather's lack of parenting skills and his intent to allow further contact with the biological parents are the two primary factors why the children's best interests would not be served by allowing Grandfather's request for adoption.

The judgment and decree of adoption is supported by substantial evidence, it is not against the weight of the evidence, nor does it erroneously declare or apply the law. Point denied.

### Point II: Alleged Failure to Follow Local Court Rule

▪ As we did with Point I, we reproduce Grandfathers second point verbatim: "The trial court erred in the judgment being signed by a judge who did not preside at the hearing, because it erroneously applied the law in that it violated local rule 6.1.3 as the hearing was a contested matter."[7] Except for Grandfather's quotation

---

7. The local rule provides: "In the absence of any judge of this circuit, any other judge of this circuit ... [is] assigned and may act in behalf of the absent judge upon any matter which is uncontested, may be heard ex parte,

of local rule 6.1.3, his "argument" beneath this point is three brief paragraphs in length. There is no analysis, either in the point or the argument, of how Grandfather was prejudiced by the alleged failure to comply with the rule. Moreover, Grandfather never presented that complaint to the Juvenile Court.

As in Point I, Grandfather's second point is merely an abstract statement of law. The argument portion is wholly inadequate as it provides virtually no analysis and no discussion of prejudice. These reasons justify denial of the point. But, more importantly, the issue has been waived by Grandfather. Failure to follow a procedural rule must be raised at the first opportunity; otherwise, the litigant waives such alleged error.[8] *Karolat v. Karolat,* 151 S.W.3d 852, 859[16] (Mo.App. 2004); *State v. Williams,* 46 S.W.3d 35, 39–40[4] (Mo.App.2001). Point denied.

The judgment of the Juvenile Court is affirmed.

---

or requires an emergency order or judgment." Rule 6.1.3, 29th Judicial Circuit.

8. Recognizing his point's shortcomings, Grandfather attempts to characterize Judge Dermott's actions in jurisdictional terms. Grandfather argues that a judge *who did not hear the evidence* could not sign a judgment rendered on that evidence, and any such judgment was a nullity, citing *Lansing v. Lansing,* 736 S.W.2d 554, 558 (Mo.App.1987). That proposition is sound, but inapposite. Judge Dermott specifically stated that he was acting in the absence of Judge Dally, i.e., he was signing the judgment that Judge Dally prepared on his behalf. This was apparently done on an emergency basis, namely, to expedite the finality of the judgment for purposes of appeal as juvenile matters are given priority under the statutes. Judge Dermott made no independent judgment upon evidence he did not hear as the judge did in *Lansing.* Consequently, Grandfather has failed to support his point and argument with any relevant authority.