In the Matter of K.R.J.B.

E.K.M. and D.T.M., III, Respondents,

v.

T.A.B., Appellant.

No. 28090.

Missouri Court of Appeals,
Southern District,
Division Two.

July 18, 2007.

Donald Rhodes, Bloomfield, for Appellant.

Robin Phelan Rogers, Dexter, Respondents.

ROBERT S. BARNEY, Judge.

Appellant T.A.B. ("Mother"), the biological mother of K.R.J.B. ("the child"), appeals the judgment and decree of the Juvenile Court of Stoddard County ("the juvenile court") which terminated her pa-

rental rights to the child and granted the petition for adoption filed by Respondents E.K.M. ("Grandmother") and D.T.M., III ("Grandfather") (collectively "Grandparents") on the basis that Mother both abandoned and neglected the child.[1] *See* § 453.040(7) and (8). Mother alleges two points of juvenile court error. We find they lack merit and affirm the judgment and decree of the juvenile court.

■■■■ In adoption cases, as in other court-tried cases, the judgment will be sustained unless it is not supported by substantial evidence, it is against the weight of the evidence, or the trial court erroneously declares or applies the law. *In re Adoption of H.M.C.,* 11 S.W.3d 81, 86 (Mo.App. 2000); *see Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). This Court defers to the trial court's determination of credibility and to its resolution of conflicts in the evidence. *In re Adoption of T.J.D.,* 186 S.W.3d 488, 490 (Mo.App.2006). The facts and reasonable inferences therefrom are reviewed in the light most favorable to the trial court's order. *Id.* "As with any child custody proceeding, the paramount goal in an adoption proceeding is the best interests of the child." *In re C.D.G.,* 108 S.W.3d 669, 674 (Mo.App.2002).

Reviewing the evidence in the light most favorable to the juvenile court's order, *In re T.J.D.,* 186 S.W.3d at 490, the record reveals that the child was born on June 15, 1998, and he was eight years old at the time of trial. Grandmother testified that between June of 1998 and October of 1998 she kept the child "at least two to three nights a week." Grandmother stated that in October of 1998, when the child was four months old, she was "assaulted" by Mother. Grandmother related Mother and Fa-

ther had been fighting with each other when Mother "hit [Grandmother] with a bottle, started pulling [her] hair ... and [she] grabbed [Grandmother's] hand and bent the fingers back." This incident resulted in Grandmother breaking her finger in three places. Mother was later convicted of assaulting Grandmother and temporary custody of the child was given to Grandparents in late October of 1998. The child stayed with them until December of 1998 when Father and Mother, who had been separated, reconciled.

In July or August of 1999, Mother and Father "got into another argument and [Mother] took the [child] and moved to Oklahoma." In October of 1999, Father "went to Oklahoma and brought [Mother] and the [child] back." Upon their return, Grandmother's family rented Mother and Father a house to live in. On the child's second birthday in June of 2000, Mother and Father again had an altercation and Father brought the child to Grandmother's house. Grandmother reported that shortly thereafter there was an incident between Grandmother's mother ("Great Grandmother"), who was seventy years old at the time, and Mother, which resulted in the police being called and Great Grandmother being taken to the hospital with "a contusion on the back of her leg and a place around the base of her neck ... where she had been choked." Father then filed an order of protection against Mother and, on June 19, 2000, Father was given sole custody of the child by court order. Father then placed the child with Grandparents. At some point thereafter Mother was awarded supervised visitation with the child two days a week at the Stoddard County Juvenile Office. Grandmother

---

1. The record reveals Grandparents are the child's paternal grandparents. Mother was married to Grandparents' son, K.J.B. ("Father"), at the time of the child's birth. Mother and Father were divorced approximately a

month before trial. Father consented to Grandparents' petition for adoption and he does not participate in this appeal.

All statutory references are to RSMo 2000, unless otherwise noted.

stated Mother only exercised this visitation on "three or four" occasions.

Grandmother testified that Mother had supervised visits with the child on four occasions between July of 2000 and October of 2000. The record also reveals that Mother, again, moved to Oklahoma in August of 2000. Grandmother also related that in December of that year Mother and Father reunited, but the child remained with her. Grandmother stated the child spent one or two nights every other week at Mother and Father's home.

In July of 2001, another altercation ensued between Mother and Father at their home and the police intervened. The child was at Grandmother's home at the time of the incident. Father "was put in jail" and Mother went to Grandmother's home with the police. Grandmother allowed Mother to take the child and Mother had the child for "about a month...." Shortly thereafter, Mother, the child, and Mother's other children moved in with Grandparents because they "didn't have anywhere else to go."[2] Mother and her children resided with Grandparents until February of 2002. Grandmother helped Mother get "moved into the housing projects in Sikeston ..." at that time. Grandmother testified that while Mother and her children lived with Grandparents, Mother did not pay rent, work, or pay for any bills or necessities.

When Mother moved out she left the child with Grandmother, but took the other children with her. Grandmother stated, however, that the child would occasionally spend the night with Mother at her apartment. On one occasion when the child was staying with Mother, Grandmother drove past the apartment and saw the child, who was three years old at the time, sitting alone on the sidewalk. Grandmother stopped and took the child inside only to discover that Mother was locked in her bedroom asleep. Grandmother roused Mother, who was pregnant at the time, and returned the child to her. Grandmother stated the "place was in a really bad state" and "[t]here w[ere] beer bottles, liquor bottles, cigarette butts. There was urine from a dog. Feces in the floor. You could hardly walk through the house." Grandmother related there were liquor bottles laying in Mother's bed and there was "a big jug of some kind of liquor. And there w[ere] beer cans sitting in the floor with cigarette butts laying around in them." Grandmother stated she was concerned about the environment for the children. When Grandmother confronted Mother, Mother told her "to get the f* * * out. That was her f* * *ing kid and she would do what she wanted to with him, and not to come back." Shortly thereafter Mother told Grandmother that she had failed a drug test given to her by her probation officer.

In July of 2002 Mother took the child from Grandmother's house and "left the state." Grandmother did not see the child again until November of 2002 when she and Grandfather were granted guardianship of the child as a result of Mother having been arrested for violating her probation. Grandmother testified that at the guardianship hearing Mother told the court she was not able to care for the child at that time. After the guardianship hearing, Grandmother and Mother spoke and agreed to a visitation schedule.

Grandmother also related she took the child to see Mother on several occasions around Christmas of that year. At that time, Mother was residing in a trailer home with her boyfriend, J.B. ("J.B."), her three children, and J.B.'s two children.

---

**2.** At the time of trial, Mother had three other children by three different men. The children are eleven years old, nine years old, and three years old. Grandparents are only biologically related to the child at issue.

Grandmother testified the trailer home did not have heat and was being heated by a space heater. She stated Mother and J.B. had no telephone or means of transportation.

In February of 2003, J.B. went to prison and Mother asked Grandmother if she and all of the children could move back in with her and Grandfather. Grandparents agreed and Mother and the children moved back in for several months. In April of 2003, Mother took her youngest child and moved in with Father. Mother left her other two children as well as the child with Grandparents. Mother's other two children remained with Grandparents until school was dismissed for the summer.

In July of 2003, after a visit to Mother's house, Grandmother noticed the child "could not walk at all on his ... leg" and he told her he had fallen out of a tree. Mother told Grandmother she did not take the child to the doctor because "[n]othing was wrong." On July 28, 2003, there was an incident at Great Grandmother's house in which Mother and Father were "screaming and yelling ..." at each other in front of the children because Mother had invited J.B., who had just gotten out of prison, to visit the children at Great Grandmother's house. A fight ensued and Mother grabbed Grandmother's "arm, twisted [her] arm and scratched it, and slapped [her]." Mother then fled the house before the police arrived, but she was later apprehended.

Grandmother did not have any contact with Mother from July of 2003 until September 25, 2003, when Mother called and asked to see the child. They arranged a visit at McDonald's Restaurant, but Mother never showed up. In October of 2003, Mother again requested visitation and another visit was arranged to take place at McDonald's. When Mother arrived, she tried to take the child and leave. When Grandparents stopped her from leaving, she said, in front of the child, "[f]* * * you ... [t]his was f* * *ing bullshit" and left the restaurant. Grandmother did not hear from Mother again until May 3, 2004. In May of 2004, Grandparents were contacted by Mother's attorney about arranging visitation. Mother visited with the child on three occasions thereafter. After one of those visits, the child reported to Grandmother that Mother and J.B. had referred to Grandmother as "the devil." Mother missed the child's birthday party on June 12, 2004, although she had been invited. Mother failed to show up for several of her visits at McDonald's thereafter, although Grandmother kept taking the child there to meet Mother. The last time Mother saw the child was on June 12, 2004.

Grandmother testified Mother had never given Grandparents any money or help caring for and supporting the child, and she failed to give the child birthday presents or Christmas presents since 2002 when Grandparents were given guardianship of the child. Grandmother testified the child told her he would like to see his siblings but he "didn't want to go off with [Mother]."

Grandfather, likewise, testified he agreed with Grandmother's testimony. He stated that at one of the visits at McDonald's in 2004 he heard J.B. tell the child "[d]on't tell your grandma and grandpa anything," and that concerned him. He stated that the child always seemed "a little standoffish" around Mother. Grandfather testified Mother "loves her kids," but "how she takes care of them is ... another story...." Grandfather opined it would be in the child's best interests to be adopted by Grandparents.

Great Grandmother testified that Mother's eldest child lived with her off and on for a number of years and she never received any money from Mother to help support the child.

Great Grandmother also testified that in 2000 she had an altercation with Mother. She testified she arrived home with the child and Mother was waiting for her. Mother "hit [her] in the back and knocked [her] almost out ..." and she "fell down and twisted [her] ankle." As a result Great Grandmother had to receive treatment at the emergency room.

The child testified at trial. He stated that Grandparents "are really [his] mom and dad, hopefully." The child identified Father as "[his] dad. Other dad," and he identified Mother by name as well as by calling her "[his] birth mom." He stated he wanted to refer to Mother as his "[e]x-mom" and he informed the juvenile court he did not want to see or communicate with Mother. He stated he saw Mother in the hallway before trial and it made him "[k]ind of nervous." He stated he barely remembers living with Mother and stated "[s]he barely was around [him]." The child testified he did not want to see Mother because "[s]he does not take care of [him] right." He stated Mother left him home alone when he was four years old and it scared him. He stated he remembered "the bad part" about living with Mother and the only good part about living with Mother was seeing his siblings. The child stated he did not like J.B. because he spanks him hard with a belt. He reported he had seen Mother and J.B. fight a "million times" and that they would "[h]it each other and cuss[ ] at each other and yell[ ]." He stated he did not like to be around that. The child testified he remembered falling out of a tree at Mother's house. He stated there were no adults around and Mother was in bed "because she's drowsy and she likes to sleep a lot."

The child also related that he wanted to live in the house he lives in now with Grandparents and he "love[s] [Mother] in a sort of way." He felt that Mother "kind of" loves him and he could not excuse the things she had done to him in the past. He stated that Mother had never apologized to him for abandoning him and that if she told him she was sorry, it "would make [him] feel just a little bit better."

Betty Jo Berthelot ("Ms. Berthelot"), a psychological counselor, testified she had been providing counseling services to the child since September 2, 2004. The child was brought to Ms. Berthelot by Grandparents who informed her they were concerned about making the child "feel secure with his living arrangement" due to the ongoing custody issues between Mother and Grandparents. Ms. Berthelot stated that during her visits with him the child seemed "very happy, ... very stable, was doing well with school" and it appeared to her that Grandparents "were putting lots of time and energy into making sure he was involved in lots of activities." Ms. Berthelot felt the child had "lots of confidence in [Grandparents]...." When Ms. Berthelot observed Grandparents with the child, they were "[v]ery loving;" "[v]ery supportive;" and tried "to meet his needs."

Ms. Berthelot also testified that in January of 2005, the child reported to her that "he did not want to see [Mother], he was not going to ... visit with [Mother], and he wanted to not talk about it." Ms. Berthelot related that throughout their counseling the child had been expressing negative feelings toward Mother due to his perceived abandonment by her. The child told Ms. Berthelot on another occasion that he did not "know [Mother] much;" that "she is mean;" and "that she doesn't take care of him...." Ms. Berthelot also testified that the child related to her that he had been very disappointed when Mother had failed to show up for a scheduled visit in early 2006.

Ms. Berthelot visited with Mother on four occasions between February of 2006 and the time of trial in April of 2006. She

stated she met with Mother, Mother's other three children, and J.B. Ms. Berthelot felt that Mother was in "denial concerning any harmful behaviors that she may have had in the past concerning [the child's] safety ..." and seemed "to truly believe that what she does is—is okay, and it is in line with—with how parenting is done today." Ms. Berthelot thought Mother was immature and not able "to look at the total picture of what it means to be a parent." Mother informed Ms. Berthelot that she loved the child and wanted custody of him.

Ms. Berthelot concluded that she could not recommend the child have visitation with Mother due to the child's negative feelings toward her. Ms. Berthelot felt it would be harmful for the child to be removed from Grandparents' custody and that it was in the child's best interests for him to be adopted by Grandparents.

Mother testified that she and Father were divorced a month before trial and she was awarded custody of the child "subject to the guardianship [by Grandparents] and these proceedings...." Mother stated she was not currently employed and had been fired from her last job due to her "emotions" and being late. Mother stated she had been convicted of "hot check" violations and assault; had abused "[c]rank and marijuana;" had abused methamphetamine while residing with Grandparents; had violated probation by failing a drug test while she was pregnant in 2002; had fled the state when she learned there was a warrant out for her arrest; drinks on occasion; does not currently take drugs; and had been attending church.

Mother related she and Grandmother had a long history of problems with each other and that Grandmother "never liked [her] since the day she met [her]. Never." She stated she had done drugs with Grandmother and Grandmother had given drugs to her and Father on numerous occasions. Mother related the altercation between her and Grandmother in October of 1998 occurred because Grandmother "spit in [her] face." Mother denied twisting Grandmother's arm and fingers during the incident and related she merely pushed Grandmother. Regarding the incident with Great Grandmother in June of 2000, Mother related Father had taken the child from their house while she was in the shower and gone to Great Grandmother's home. Mother, who was pregnant at the time, went to Great Grandmother's home, where the altercation occurred, and she was arrested and incarcerated for two weeks. Mother related that when she was not living with Father she moved around quite often and stayed with various friends and family members including Great Grandmother and Grandparents. She often left her children with family members as well. At one point she stayed at the House of Refuge, a homeless shelter for families.

Mother related that after being arrested for violating her probation in November of 2002, she was served with guardianship paperwork from Grandparents and she appeared at the hearing at which Grandparents were granted guardianship of the child. Thereafter, she moved in with Grandparents in early 2003 and stayed several months. Mother stated that while residing with Grandparents she gave them "[e]very bit of [her] food stamps ..." and she helped with housework. She stated she did later exercise her visitation by meeting Grandparents at McDonald's, but she had been under the impression she was allowed to take the child for the weekend and not merely exercise a two hour supervised visit at the restaurant. She stated she did "cuss at" Grandparents on the first visit to McDonald's. Thereafter, she "tried to" make the appointed visitations every other weekend.

Mother also testified she did not attend the child's birthday party or his graduation; she did not remember an incident where the child fell out of a tree at her home; and she denied the July of 2002 incident involving Grandmother after which she fled the premises before the police arrived. Mother also confirmed the fact that she had not given the child any presents or cards since he had been with Grandparents. Mother felt the adoption should not be granted because Grandparents have not "done what's best for [the child]" because they "haven't tried to keep him in contact with [Mother]."

J.B. testified he had two children of his own and those children resided with his mother whom they "bec[a]me accustomed to staying with ..." when he had been incarcerated. He stated he had been convicted of burglary and had previously been addicted to marijuana and methamphetamine.[3] He related he had used in methamphetamine with Mother, who was pregnant at the time, and Grandmother in December of 2001 or January of 2002.[4] J.B. admitted that he and Mother had an "altercation" in early 2005 in which the police were called. He stated he had gotten frustrated due to holiday stress and he had slapped Mother with an "[o]pen hand" in front of the children. He stated he and Mother had been together "pretty much for five years" and planned on getting married soon. He stated he loved Mother's children like they were his own

children. He also related that he and Mother had purchased presents for the child every birthday and Christmas, but had never been given a chance to give them to him.

Natalie Riley ("Ms. Riley"), the child's guardian ad litem, testified that throughout her dealings with the child he had always indicated he wanted to live with Grandparents and did not want to see Mother. She recommended the adoption be granted "based upon the instability[,] the lack of support financially and emotionally, ... the lack of ... efforts [by Mother] to contact the child, ... the limited visitation over the last four years, and the leaving for out of state when the warrant was in place in total disregard for the law...." She stated the child needs the stability that adoption would bring.

Based on the aforementioned evidence, the juvenile court terminated Mother's parental rights on the basis of section 453.040(7), abandonment and neglect, in that "[s]aid natural mother has for a period of at least six (6) months immediately prior to the filing of the Petition For Adoption, willfully abandoned the child ... and/or willfully, substantially and continuously neglected to provide the child with necessary care and protection."[5] The juvenile court, thereafter, determined that termination of Mother's parental rights to the child was in the child's best interests. Accordingly, the juvenile court terminated Mother's parental rights to the child and

---

3. Kimberly Crumley, J.B.'s probation officer, testified J.B. had prior criminal charges of residential burglary in the first degree; assault in the first degree with serious physical injury; armed criminal action; robbery in the first degree; domestic assault of Mother; and writing bad checks.

4. Grandmother testified she had never used methamphetamine.

5. Section 453.040(7) provides, in part pertinent to our review, that the consent to the adoption of a child is not required of:

> A parent who has for a period of at least six months, for a child one year of age or older ... immediately prior to the filing of the petition for adoption, willfully abandoned the child or, for a period of at least six months immediately prior to the filing of the petition for adoption, willfully, substantially and continuously neglected to provide him with necessary care and protection.

granted Grandparents' petition to adopt the child. This appeal by Mother followed.

In her first point relied on, Mother asserts the juvenile court erred in finding she

had willfully abandoned [the] child because abandonment is defined by law as the voluntary and intentional relinquishment of custody of a child with the intention that severance be of a permanent nature or as the intentional withholding by a parent of his care, love, protection and presence without just cause or excuse as the record reflects that [Mother] initiated proceedings to regain custody of her child and defended against actions to terminate her parental rights and her care, love, protection and presence with the child were frustrated by [Grandparents] creating just cause.

■ We initially note while Mother challenges the juvenile court's finding that she had abandoned the child, she does not challenge the juvenile court's finding that she neglected the child. "[A] finding of neglect, alone, if supported by substantial evidence, will support termination in an adoption case." *In re S.L.M. v. D.L.N.*, 167 S.W.3d 736, 741 (Mo.App.2005). Accordingly, we need not review Mother's point as it relates to the juvenile court's abandonment findings but gratuitously review whether the juvenile court erred in its determination that Mother had neglected the child as set out in section 453.040(7).

■ "The essence of neglect has been characterized as the failure to perform the duty with which the parent is charged by the law and by conscience." *In re S.J.S.*, 134 S.W.3d 673, 678 (Mo.App.2004). "Neglect, which must be willful under section 453.040(7), is thus a question of intent, which is frequently a fact inferred from relevant conduct, particularly within the statutory period, but also before and after this period." *Id.* "If the natural parent fails to provide support, he or she must

demonstrate why such neglect is not willful, in order to defend against the adoption petition." *In re J.P.B.*, 186 S.W.3d 767, 770 (Mo.App.2006).

■ We note that Grandparents' petition for adoption was filed on December 16, 2004. Grandmother testified Mother last saw the child on June 12, 2004, which was more than six months prior to the filing of the petition for adoption. Grandmother also testified that during that six month period of time Mother not only failed to visit the child, but she also failed to provide financial or other support for the child and failed to contact Grandparents except on a sporadic basis. *See* § 453.040(7). Indeed, prior to the aforementioned time period Grandmother related that Mother never gave her money or food to help in caring for the child when he was young or after she had guardianship of him. Mother testified she gave food stamps to Grandmother when she lived there, but admitted she did not provide other financial support or gifts to the child. Mother also testified she had never sent the child cards or presents, but stated she bought him gifts and had never given them to him. The juvenile court gives "[l]ittle or no weight" to token and infrequent contributions to support. *In re P.L.O.*, 131 S.W.3d 782, 789 (Mo. banc 2004). In an adoption action, "[n]eglect is typically demonstrated by a parent's failure to provide financial support, without just cause or excuse, whether or not ordered by judicial decree." *In re J.P.B.*, 186 S.W.3d at 769.

As previously related, the juvenile court determined that the natural mother had "for a period of at least six (6) months immediately prior to the filing of the Petition For Adoption ... willfully, substantially and continuously neglected to provide the child with necessary care and protection." In making its determination

that Mother neglected the child pursuant to section 453.040(7), the juvenile court specifically found there was evidence Mother had repeatedly and continuously failed "to provide the child with adequate food, clothing, shelter or education or other care and control necessary for the child's physical, mental or emotional health and development," although Mother was physically and financially able to do so. Furthermore, the juvenile court set out that Mother "has not provided any food, clothing, shelter or education for the child or other care necessary for the child's physical, mental or emotional health and development for several years...." It also noted that "the majority of the child's life, even prior to the establishment of the [g]uardianship in December of 2002, has been spent with [Grandparents]."

Grandmother likewise testified the child had been in her custody off and on since his birth and had been in her exclusive custody since November 2002 when Grandparents were granted guardianship of the child. After the guardianship proceedings, Grandparents transported the child to see Mother on numerous occasions at their own expense and without the requirement that they do so by court order. Mother did not contact Grandparents or see the child from July of 2003 until October of 2003. Mother thereafter saw the child on four or five occasions at McDonald's and the last time Mother saw the child was on June 12, 2004. Mother also failed to attend the child's birthday party and did not attend his kindergarten graduation. Mother did not contact Grandparents for long periods of time and never provided any contact information to them so they could reach her in the event of an emergency. In making its findings, it is well within the juvenile court's province to " 'consider the length of time a child is out of a parent's custody and the limited contact during that time.' " *In re N.L.B.*, 145 S.W.3d 902, 908 (Mo.App.2004) (quoting *In*

*re S.L.N.*, 8 S.W.3d 916, 924 (Mo.App. 2000)). Additionally, as in termination cases under section 211.447, there is an " 'affirmative duty on the part of the parent to support, communicate and visit the child and to show that the parent is committed to the child by showing an interest.' " *In re A.S.*, 38 S.W.3d 478, 484 (Mo.App.2001).

We also observe that Mother testified she had lived with various family members off and on for short periods of time; stayed in a homeless shelter with her children; lived in a trailer without heat in the middle of winter; lived with Grandparents, Great Grandmother, and her own mother several different times; did not have reliable transportation much of the time; did not have a telephone for a long period of time; was not employed and had been fired from her last job for being late; had been arrested on numerous occasions; had used various drugs in the past including when she was pregnant; had knowingly left the state to avoid an arrest warrant; and had been involved in instances of domestic violence in front of the children. "A good environment with stability and structure is utterly vital to development and a child's best interests." *In re T.J.D.*, 186 S.W.3d at 496. While we commend Mother for the fact that she is no longer using drugs, is attending church, and is finally taking an interest in the child,

> [a]ll grounds for termination of parental rights must to some extent look to past conduct because past conduct provides vital clues to present and future conduct. Otherwise, a parent may argue that she has reformed since the filing of the petition; reformation having occurred while the child was away.

*In re I.Q.S.*, 200 S.W.3d 599, 605 (Mo.App. 2006). As such, this Court finds there was clear, cogent and convincing evidence sup-

porting the juvenile court's finding that Mother neglected the child.

 Additionally, in reaching the conclusion that termination of Mother's parental rights was in the child's best interests, the juvenile court also determined that "the child lacks emotional ties to [Mother];" Mother "has not maintained regular visitation or other contact with the child;" Mother "has not made any payment for the cost of care and maintenance of the child even though financially able to do so;" "additional services are not likely to bring about lasting parental adjustment enabling a return of the child to [Mother] within an ascertainable period of time based upon the testimony of the child's counselor;" and Mother's "actions are indicative of her disinterest in and lack of commitment to the child."

> 'As with any child custody proceeding, the paramount goal in an adoption proceeding is the best interests of the child. As the central goal of the proceeding is to promote the best interests of the child, a greater burden is imposed on the trial court than simply according all parties a fair trial.'

*In re T.J.D.*, 186 S.W.3d at 490 (quoting *In re C.D.G.*, 108 S.W.3d at 674). " 'The determination of what is in a child's best interests is an ultimate conclusion for the [juvenile] court based on the totality of the circumstances.' " *In re D.M.B.*, 178 S.W.3d 683, 689 (Mo.App.2005) (quoting *In re D.L.W.*, 133 S.W.3d 582, 585 (Mo.App. 2004)).

There was testimony that the child was bonded to Grandparents, considered them to be his parents, and did not feel a bond with Mother. The child himself testified repeatedly that he did not want to see Mother, let alone live with her; and he testified to observing domestic violence when he was in her care. Mother testified she had not seen the child since June of 2004 and had failed to provide any kind of support for the child since the child was in Grandparents' care. Mother also testified she was not employed and gave no explanation for her failure to work and support the child. Mother admitted she rarely called the child and went long periods of time without even contacting the child and Grandparents. There was testimony from several people relating to Mother's violent tendencies and drug use as well as her unstable lifestyle. Based "on the totality of the circumstances," termination of Mother's parental rights was in the best interests of the child. *See In re C.D.G.*, 108 S.W.3d at 674. Point One is denied.

Mother's second point relied on maintains the juvenile court "committed reversible error in failing to maintain an impartial attitude and status of neutrality, and the [juvenile] court should not conclude in advance of the [court's] termination what the decision is to be, to do so is to adjudge the controversy without hearing evidence that ought to resolve it. . . ." In support of this assertion, Mother asserts "the record reflects during the questioning of [Mother's] first witness the judge remarked the testimony of the witness would not affect his decision thus negating the fairness and impartiality of the proceeding."

 In the present matter, Mother's counsel was questioning Rita Spence ("Ms. Spence"), a caseworker for the Children's Division of the Department of Family Services, regarding the fact that one of Mother's other children had missed numerous days of school due to chronic head lice. The following colloquy occurred:

> Counsel for Mother: Okay. And did you see anything in [Mother's] home which would make you think that she was not keeping a sanitary house—a clean house that was promulgating the problems of head lice?
>
> Counsel for Grandparents: Your Honor, unless she completed the investigation

I'm going to object to that, because I don't know if she did the investigation. Counsel for Mother: She said she was in the home four or five times.

The juvenile court: It doesn't matter how she answers. It's not going to affect the decision, so I'm going to overrule your objection. If you want to answer go ahead.

As stated in *Rutlader v. Rutlader,* 411 S.W.2d 826, 831 (Mo.App.1967),

> A judge presiding at a trial should at all times maintain an impartial attitude and a status of neutrality between contending parties. He should not conclude in advance of the end of the trial what he will do at that time. For this is to adjudge the controversy without hearing the evidence that ought to resolve it. He should exercise the highest degree of patience and forbearance toward the parties, consistent with decorum and an orderly trial, however irritating their emotional upset or personality may be, and any different attitude on his part is incompatible with that fair and impartial trial which courts require as due process.

"It is the trial court's duty not to do or say anything that might leave the impression it was not according all of the parties a fair and impartial hearing." *Cundiff v. Cline,* 752 S.W.2d 409, 412 (Mo.App.1988). " 'A judge is entitled to the presumption that he will not undertake to preside in a trial in which he cannot be impartial.' " *In re C.D.G.,* 108 S.W.3d at 678 (quoting *Blando v. Reid,* 886 S.W.2d 60, 65 (Mo.App.1994)). Further, "[t]he mere fact that a ruling is made against a party, however, does not show bias or prejudice on the part of the judge." *Farris v. Farris,* 75 S.W.3d 345, 348 (Mo.App.2002).

■ Here, this Court finds the juvenile court's comments illustrated "an impartial attitude and status of neutrality...." *Rutlader,* 411 S.W.2d at 831. The issue in this matter was whether it was in the best interest of the child to terminate Mother's parental rights based on the issues of neglect and abandonment. The evidence referenced in the above discussion was whether a Children's Division caseworker felt that Mother's sanitary or unsanitary home was the source of her daughter's repeated head lice infestation, which caused her to miss numerous days of school. It appears to this Court that the juvenile court's comment that "[i]t doesn't matter how she answers. It's not going to affect the decision" was in reference to the fact that this testimony was irrelevant to the issues before it and, thus, was not going to play a role in the juvenile court's determination. It was not evidence that the juvenile court had "conclude[d] in advance of [its] termination what the decision is to be...." Further, we make such determinations " 'in light of the full record, not simply in light of an isolated incident.' " *Berry v. Berry,* 654 S.W.2d 155, 159 (Mo.App.1983) (quoting *In re Federal Skywalk Cases,* 680 F.2d 1175, 1184 (8th Cir.1982)). There is nothing in the record to suggest the juvenile court made a decision prior to hearing all of the evidence before it, or made a decision with a lack of impartiality and neutrality. Point Two is denied.

The judgment of the juvenile court is affirmed.

RAHMEYER, J., and LYNCH, C.J., concur.