**In re the ADOPTION OF: C.P.G.B., a minor, P.J.B., Appellant,**

**v.**

**D.A.P. and N.L.P., Respondents.**

**No. SD 29902.**

Missouri Court of Appeals, Southern District, Division One.

Jan. 27, 2010.

Richard D. Winders, Bolivar, for Appellant.

Lisa C. Henderson, Buffalo, for Respondent.

ROBERT S. BARNEY, Judge.

P.J.B. ("Appellant"), the biological father of the minor child C.P.G.B. ("Child"), appeals the judgment of the Juvenile Division of the Circuit Court of Polk County, Missouri ("juvenile court"), which denied his "First Amended Consolidated Petition for Review" ("Petition for Review"), filed pursuant to section 511.170, to set aside the adoption of Child by D.A.P. ("Mother")

and N.L.P. (collectively "Respondents").[1] Appellant asserts four points of juvenile court error. We affirm the judgment of the juvenile court.

"Reviewing the evidence in the light most favorable to the juvenile court's ..." decision, *In re K.R.J.B.*, 228 S.W.3d 611, 613 (Mo.App.2007), the record reveals that on January 2, 2007, a "Judgment and Decree of Paternity and Custody" was entered by the juvenile court which, *inter alia*, determined Appellant was Child's biological father and granted him visitation rights with Child. On August 26, 2007, Appellant signed an "Entry of Appearance, Waiver of Service, and Consent to Adoption" ("the consent form") in which he specifically consented to Child's adoption.[2] Thereafter, on October 29, 2007, Respondents filed their "Petition for Transfer of Legal Custody and Adoption" and on June 11, 2008, the juvenile court entered a "Judgment and Decree of Adoption" which granted Respondents' request to legally adopt Child.

Almost four months later, on November 7, 2008, Appellant filed his Petition for Review in which he argued the adoption judgment should be set aside because his consent was invalid in that the paperwork he signed did not conform to a form promulgated by the Missouri Department of Social Services ("DSS") and he "did not understand or comprehend the import of ..." signing the consent form. He further argued that if he did consent to the adoption, he was now revoking such consent and he requested the juvenile court set aside or annul the adoption decree "[b]ased on the irregularities appearing on the face of the record...." Appellant also requested relief from the judgment of adoption under Rule 74.06(b)[3] due to his mistake in signing the consent form, and he requested the adoption decree be set aside due to the juvenile court's failure to consider the best interests of Child.

A hearing was held on Appellant's Petition for Review on May 6, 2009. At this hearing, Appellant testified the paternity decree granted him visitation with Child, who resides with Mother, and he exercised his visitation on a regular basis.[4] As for

1. Child was born in 2002 and she was six years old at the time of the hearing in this matter. Respondents are Child's biological mother and her husband.
   Statutory references are to RSMo 2000 unless otherwise indicated.

2. The consent form set out in full:
   I, [Appellant], state that I am the natural father of [Child], a female child born out of wedlock.....
   I hereby consent to the adoption of this child by [Respondents], and hereby enter my appearance, waiving the issuance and service of summons. I have been informed of my right to be represented by an attorney in this case; I consent to venue of this action in Polk County, Missouri, and I waive protest and objection as to jurisdiction of said Court to hear and determine this cause; I consent that said adoption may be heard at anytime the Court consents to hear the same; I hereby enter my appearance for all purposes connected with

the adoption of [Child] and consent that same be tried as though I have been served with process. I am not now a member of the Armed Forces of the United States or its allies; and I consent to immediate hearing on the Petition and entry of decree in conformity with the relief therein prayed.
   I further understand the importance of identifying all possible fathers of the child and may provide the names of all such persons; and I understand that if I deny paternity, but consent to the adoption, I waive any future interest in the child.

3. All rule references are to Missouri Court Rules (2008).

4. Appellant testified on cross-examination that he was granted two, ten-day periods of visitation with Child in the summer of 2007 and he did not have Child for the entirety of those visitation periods. During these longer visitation periods, Child would often spend her days with Appellant and he would take

the consent form, he stated he went to Mother's attorney's office and signed the form which he thought was "to stop the child support order by the [c]ourt" and to change the visitation schedule. He stated he had two or three conversations with Mother about signing the paperwork before he actually signed the form. He further related that Mother had raised the issue of his consenting to adoption back in 2007 when the paternity action was pending, but she never mentioned this form related to adoption.

Appellant also testified he had an eleventh grade education and could read, but that he did not read the consent form before he signed it. He stated he did not feel it was necessary to read the form because he believed signing away his rights to his child would be a more difficult procedure than just signing a form. Appellant related he never intended to consent to the adoption and that was never his desire.

Appellant stated that after signing the consent form he continued exercising visitation with Child and saw her almost every other weekend after that time. Appellant further related that for several months after he signed the consent form Mother returned his child support payments to him because "[s]he said she didn't want it." He testified that the last weekend in July of 2008 he found out that Respondents had legally adopted Child, he hired an attorney, and visitation with Child was thereafter halted. He stated he had not seen Child since that time despite his efforts to contact Mother to arrange visitation. He also stated he treated Child the same after he signed the consent form as he did prior to signing the consent form. He related he wanted to have contact with Child and

that he believed it was in Child's best interests that his parental rights be restored.

Appellant's wife, R.B. ("Step–Mother"), testified that she had been married to Appellant since January of 2006 and became acquainted with Child in October of 2003. She related there was only one time she could recall that Appellant did not exercise his visitation with Child and that occurred in March or April of 2007 when they arrived to pick up Child and she was not home. Step–Mother recalled that in July of 2008, Mother left them a message saying "her adoption had already gone through, and that if [Appellant] was willing to work with [Mother] then he'd get to see [Child], but if not, that he would not see her anymore." She related they did not visit with Child after that call from Mother. She related Appellant never mentioned to her that he had consented to Child's adoption although she knew he had gone to an attorney's office to sign some paperwork and he acted no different in his dealings with Child after signing the consent form.

Mother testified that Child was "[q]uite frequently" upset and emotional prior to her visits with Appellant. She related that on one occasion in April of 2007 Child was so upset about visiting with Appellant that Appellant did not force her to come to visitation and he, instead, informed Mother that he did not want to pay child support if he was going to be unable to see Child regularly. Mother stated she spoke with Appellant about consenting to adoption on several occasions in early 2007, and she related that after several phone calls they "were in agree[ment] that the adoption would probably go ahead and take place." She related that thereafter she and Appel-

---

her home to Mother's house at night because she was not used to staying at his house for long periods of time. He further testified that

he attempted to exercise his visitation on other occasions but was denied visitation with Child by Mother.

lant discussed the names of various attorneys to use for the adoption and that sometime in May of 2007, they came to an agreement on which attorney to use. She stated he "gave [her] the impression that he did not want [Step–Mother] to find out about [the] adoption.... And when [they] did come to an agree[ment] on the attorney, he made sure that he did not want things mailed to his residence."

Mother also related that throughout this time period Child continued to visit Appellant when she wanted and Mother felt it was in Child's best interests to do so. She stated that Child's visits with Appellant "were very inconsistent" and she often just spent one or two nights a month at his house. She testified Child went to Appellant's house for one of her ten-day visits in June of 2007, and Child wanted to come home because she was upset and Appellant brought her home. Mother also testified that she told Appellant at that time that they could call off the adoption and he declined to do so. Mother related that she and Appellant had agreed that despite the adoption they would allow Child to decide if and when she wanted visitation with Appellant. Mother felt this situation would be an "open adoption" and Child "would still be able to visit [Appellant] as she wished" because it was in Child's best interests to have contact with Appellant and his family. She related that at that time Child could have contact with Appellant as she wished, but Mother testified Appellant had not attempted to have visitation with Child since June or July of 2008, and had not even contacted her during the holidays.[5] Mother stated Child was doing well after the adoption and it served her best interests.

Child's guardian ad litem, Verna Lee Haun ("Ms. Haun"), testified Child expressed to her an interest in seeing Appellant and that it was her recommendation that it was in the best interests of Child for the adoption decree to be set aside. That being said, she also related Child seemed happy and well-adjusted in her home with Respondents.

After hearing evidence, the trial court entered its "Judgment on First Amended Consolidated Petition for Review" in which it found Appellant "has failed to state a claim under [s]ection 511.170 ...;" that Appellant is not "entitled to relief under ... Rule 74.06(b);" declined to "exercise its equitable powers to set aside or annul the Judgment and Decree of Adoption ...;" and awarded attorney's fees payable by Appellant to Ms. Haun as Child's guardian ad litem. This appeal by Appellant followed.

■ In his first point relied on, Appellant asserts the juvenile court "misapplied the law in declining to exercise its equitable authority to annul the Judgment of Adoption...." He maintains the juvenile court was "required to consider ... Child's welfare, in that the [juvenile] court possesses equitable authority to set aside the Judgment of Adoption and is required to consider the best interest of ... Child [in] making such determination." In his second point relied on, Appellant argues the juvenile court erred in "declining to exercise its equitable powers to set aside or annul the Judgment of Adoption" because its ruling was "not supported by substantial evidence, in that the evidence presented established that the best interest of [C]hild required setting aside and annulling the Judgment." In that Appellant's

**5.** Mother related Appellant and Step–Mother sent Child balloons for her birthday in February of 2009.

first two points relied on are interrelated we shall address them together.

In support of these points relied on, Appellant cites to *McDuffee v. McDuffee*, 352 S.W.2d 23 (Mo. banc 1961), for the proposition that the juvenile court may exercise its equitable powers in annulling judgments of adoption. In *McDuffee*, the adoptive parents sought to annul an adoption decree based on the fact that the adopted child suffered "from mental disturbance ..." such that she needed to be committed to a "protective environment of an institutional kind for her own welfare and that of society." *Id.* at 24. The guardian ad litem filed a motion to dismiss their request "for failure to state a claim on which relief could be granted." *Id.* The trial court denied the adoptive parents' request to annul the decree and they appealed arguing that in addition to the statutory method for annulling an adoption decree, trial courts should be able to exercise their equitable powers in overturning such decrees. *Id.* at 25. The high court determined that "upon clear showing that the higher welfare of the child demands such action courts of equity may so annul a valid decree of adoption ..." and

> that, inasmuch as the welfare of the child (which frequently requires consideration of many factors) is ever paramount in *decreeing* adoption, the same principle is likewise a major factor to be considered in connection with such other factors affecting justice and fairness to all persons concerned as shall, in the sound discretion of the chancellor, determine the merits of an action to annul thence forward a prior valid decree of adoption.

*Id.* at 27. The Supreme Court of Missouri further set out that "[d]espite, however, the primacy of the welfare of the child as grounds for adoption or annulment, the courts evince a decided reluctance to annul such a decree and especially is that the case where the annulment is sought by the adoptive parents." *McDuffee*, 352 S.W.2d at 23. Accordingly, our high court upheld the finding of the trial court:

> [c]onsidered in the light of the conclusions above reached, the petition [to annul the adoption decree] in the instant case is clearly insufficient.... The record in this case shows that the natural parents abandoned their child. It cannot now be in the best interest of that child that a court of equity, on petition of its adoptive parents, decree it a similar fate.

*Id.* at 27–28.

*McDuffee* does not aid Appellant. This Court "presume[s] that the decision [of the juvenile court] was motivated by what the judge believed was best for [Child], and we accord the judge's determination greater deference than in other cases." *In the Matter of Williams*, 672 S.W.2d 394, 395 (Mo.App.1984). "'A good environment with stability and structure is utterly vital to development and a child's best interests.'" *In re K.R.J.B.*, 228 S.W.3d at 620 (quoting *In re T.J.D.*, 186 S.W.3d 488, 496 (Mo.App.2006)).

In the instant matter, it was not a misapplication of the law for the juvenile court to decline to exercise its equitable powers. Based on the totality of the evidence presented, there was not a "clear showing that the higher welfare of the child demand[ed] such action...." *McDuffee*, 352 S.W.2d at 27. There was little, probative evidence showing that the juvenile court failed to consider the best interests of Child in making its decision. There was evidence presented that Child was happy and well-adjusted in Respondents' home where she had lived with Mother since her birth. There was also testimony from Mother that she was not opposed to Appellant having continued contact with Child,

but that it was Appellant who ultimately withdrew from the situation. There also was testimony from both Mother and Appellant that Appellant did not fully exercise his visitation rights with Child prior to the adoption. We defer to the juvenile court on issues of witness credibility. *In re Adoption of F.C.*, 274 S.W.3d 478, 482 (Mo.App.2008). There was substantial evidence from which the juvenile court could have found the adoption was in the best interests of Child and there was little evidence showing that the "higher welfare" of Child would have been better served by the trial court exercising its equitable powers to set aside the decree of adoption. *McDuffee*, 352 S.W.2d at 23. Points I and II are denied.

■ In his third point relied on, Appellant asserts the juvenile court erred in finding Appellant did not state a claim under section 511.170 because the juvenile court's "ruling was not supported by substantial evidence, in that the evidence established irregularities appearing on the face of the record." Appellant argues that irregularities in the record should grant him relief under section 511.170 and the adoption decree should be set aside for "good cause."

Section 511.170, regarding petitions for review, sets out that:

> [w]hen such interlocutory judgment shall be made and final judgment entered thereon against any defendant ... who shall not have appeared to the suit ... such final judgment may be set aside, if the defendant shall, within the time herein limited, appear, and by petition for review, show good cause for setting aside such judgment.

■ A key principle in the application of section 511.170 is that it applies only in the situation where a person has not "appeared to the suit...." Here, however, Appellant executed the consent form which was clearly entitled "Entry of Appearance, Waiver of Service, and Consent to Adoption" which also recited that he "hereby enter[s][his] appearance for all purposes connected with the adoption of [Child] and consent[s] that same be tried as though [he] ha[d] been served with process." "The [P]etition for [R]eview filed by [Appellant] does not state he was not summoned, and does not state that he did not appear to the suit." *Edwards v. Rovin*, 322 S.W.2d 144, 145 (Mo.App.1959). Additionally, Appellant's assertions that he failed to read the consent form and had no knowledge of its contents, despite signing it, does not aid him. As a general rule, "[a] party capable of reading and understanding a document is charged with the knowledge of its contents if he or she signs it, even if the party fails to review it." *Repair Masters Const., Inc. v. Gary*, 277 S.W.3d 854, 858 (Mo.App.2009). "The failure to read a document prior to signing it is not a defense, and does not make [the document] voidable, absent fraud." [6] *Id.* Furthermore, Appellant's attack on the consent form also fails because the alleged defect—that the consent form was mistakenly entered without his understanding—does not appear on the face of the record. It is axiomatic that "[t]o set aside a final judgment under a petition for review, the irregularity must appear on the face of the record." *D.L.G., Sr. v. E.L.S.*, 774 S.W.2d 477, 481 (Mo. banc 1989). Such irregularities "must be patent on the record and must not depend on proof beyond the record" and "must be based on an inspection

---

6. In his pleadings, Appellant alternatively requested relief from the judgment on the basis of Rule 74.06(b), alleging fraud, misrepresentation and misconduct by Mother; Appellant did not plead fraud relative to his request to set aside the judgment pursuant to section 511.170.

of the record alone and may not be made where the defect does not appear on the record." *Id.* Appellant's alleged defect does not appear on the face of the record and could only be raised via the taking of additional evidence. This is not the sort of scenario which warrants relief under the statute at issue. The juvenile court did not err in finding Appellant's Petition for Review failed to state a claim under section 511.170. Point III is denied.

■ In his fourth point relied on, Appellant maintains the juvenile court erred in finding he was not entitled to relief under Rule 74.06(d) "because the [juvenile] court's ruling was not supported by substantial evidence, in that Appellant established his mistake in executing the [consent form]."

In determining what mistake was established by Appellant before the juvenile court, we must turn to his Petition for Review and his argument in support of his point relied on. In his Petition for Review, Appellant urged the juvenile court to grant him relief pursuant to Rule 74.06(b) because of his "mistake regarding the import of his execution of the [consent form]" and due to Mother's "fraud, misrepresentation and misconduct in representing to [him] that the [consent, form] related to child support matters only."

■ Rule 74.06(b) sets out that:

[o]n motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment or order for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is irregular; (4) the judgment is void; or (5) the judgment has been satisfied, released, or discharged, or a

prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment remain in force.

Such motions cannot prove themselves and "[t]here must be competent evidence to establish mistake, inadvertence, or excusable neglect." *Johnson v. Brown,* 154 S.W.3d 448, 451 (Mo.App.2005). " 'A motion to set aside a judgment under Rule 74.06 is governed by the sound discretion of the trial court.' " *Allison v. Allison,* 253 S.W.3d 91, 93 (Mo.App.2008) (quoting *Crossland Constr. Co., Inc. v. Alpine Elec. Constr. Inc.,* 232 S.W.3d 590, 592 (Mo.App. 2007)).

■ It is our observation that what Appellant is attempting to do is to use Rule 74.06(b) as an alternative to a timely appeal. However, "Rule 74.06(b) reaches only procedural errors which, if known, would have prevented entry of a judgment." *Finley v. St. John's Mercy Med. Ctr.,* 958 S.W.2d 593, 597 (Mo.App.1998). "Rule 74.06 does not serve as an alternative to a timely appeal. . . ." *Johnson,* 154 S.W.3d at 452. It is in this posture that we expansively address Appellant's point relied on.

■ In his argument in support of his point relied on, Appellant argues his testimony before the juvenile court regarding his mistake did not constitute a mistake of law but, instead, was a mistake of fact. We disagree. It is our view that Appellant's "mistake" regarding "the import of [Appellant's] execution of the [consent form]" constituted a mistake of law. As Appellant recognizes, "[a] mistake of law does not constitute grounds to set aside a judgment under Rule 74.06(b)." *Gibson v. White,* 904 S.W.2d 22, 25 (Mo.App.1995).

Second, as for the purported failure to have presented to him a form promulgated by DSS as set out in section 453.030.8, it is difficult to discern how Appellant was ei-

ther mistaken or otherwise prejudiced by this purported omission because, in either event, he failed to read any portion of the consent form that *was* presented to him.

Third, there is an element of negligence by Appellant involved here. Appellant's alleged "mistake" in executing the consent form was based on the fact that he failed to read *any* portion of the document which was clearly titled "Entry of Appearance, Waiver of Service, and Consent to Adoption." We reiterate the general rule that "[a] party capable of reading and understanding a document is charged with the knowledge of its contents if he or she signs it, even if the party fails to review it." *Repair Masters*, 277 S.W.3d at 858. Given these circumstances Appellant's negligence in failing to read the consent form did not constitute "excusable neglect"[7] as defined by case law, and was inexcusable on this basis, "save for the possibility of promises made by the adverse party." *Gibson*, 904 S.W.2d at 25. As for this latter possibility, as set out in his brief, Appellant testified that Mother led him to believe that the consent form somehow pertained to altering the child support agreement embodied in the decree of adoption such that he blindly went to her attorney's office and signed the consent form without reading it. He related that they had discussed at one time the fact that Respondents wanted to adopt Child, but he stated he previously told Mother he had no desire to consent to an adoption such that he was blindsided to discover she was pursuing such an action. Mother, on the other hand, testified that she had numerous discussions with Appellant about consenting to adoption; that he had input into selecting an attorney for the adoption; and that he was fully aware that he was signing a document to consent to Child's adoption. She further related she and Appellant had several conversations relating to the fact that Appellant would still be able to visit with Child as Child desired. In rendering its decision, the juvenile court obviously believed the testimony of Mother over that of Appellant and it was within the juvenile court's province to do so. *See In re Adoption of F.C.*, 274 S.W.3d at 482. Appellant has failed to prove either "mistake" or "excusable neglect" resulting from "promises made by the adverse party." *Finley*, 958 S.W.2d at 597.

With that being said, we gratuitously observe that Appellant also argued in his Petition for Review, fraud on the part of Mother in convincing him to sign the consent form. "Rule 74.06(b) permits the court to set aside a judgment founded on fraud and eliminates the distinction between intrinsic and extrinsic fraud for purposes of the rule." *State ex rel. Mo–Nebraska Express, Inc., v. Jackson*, 876 S.W.2d 730, 734 (Mo.App.1994). "Equity, as it relates to a claim of fraud, will not permit a new trial unless it involves fraud that prevents a party from having a trial or from the full presentation of its case." *Id.* "[T]here can be no basis for setting aside a judgment unless one party prevented the other party, through fraud from 'fully exhibiting and trying his case.'"[8] *Id.* (quoting 31 Am.Jur. *Judgments* § 655 (1940)).

---

7. Excusable neglect has been defined as a '[f]ailure to take the proper steps at the proper time, not in consequence of the party's own carelessness, inattention, or willful disregard of the process of the court, but in consequence of some unexpected or unavoidable hindrance or accident, or reliance on the care and vigilance of his counsel *or on promises made by the adverse party.*' *Finley*, 958 S.W.2d at 597 (quoting *Gibson*, 904 S.W.2d at 25) (emphasis added).

8. "'[E]ven perjury ... does not suffice to allow the litigant another opportunity to try the merits of the case.'" *Id.* (quoting *Barker*

Here, there was no evidence presented at trial showing that Appellant was prevented from fully exhibiting or trying his case. Nothing that took place at trial prevented Appellant from completing a full presentation of his case. *See id.* at 735. Appellant did not prove fraud in the present matter. The juvenile court was correct in rejecting Appellant's request for relief under Rule 74.06(b). Point IV is denied.

The judgment of the juvenile court is affirmed.

BATES, P.J., and BURRELL, J., concur.

*v. Friendly Am., Inc.,* 606 S.W.2d 457, 460     (Mo.App.1980)).